[No. B190482. Second Dist., Div. Four. May 3, 2010.]

FRANKLIN MINT COMPANY et al., Plaintiffs and Appellants, v. MANATT, PHELPS & PHILLIPS, LLP, et al., Defendants and Respondents.

314

## Counsel

Loeb & Loeb, Andrew S. Clare, Lawrence B. Gutcho; Akin Gump Strauss Hauer & Feld, William A. Norris, Edward P. Lazarus, L. Rachel Helyar, Michael C. Small and Rex Heinke for Plaintiffs and Appellants.

Horvitz & Levy, David M. Axelrad, John A. Taylor, Jr., Frederic D. Cohen; Munger, Tolles & Olson, Michael R. Doyen and Brad D. Brian for Defendant and Respondent Manatt, Phelps & Phillips, LLP.

Hill Farrer & Burrill, Kevin H. Brogan, Neil D. Martin and Dean E. Dennis for Defendant and Respondent Mark S. Lee.

## OPINION

**WILLHITE, Acting P. J.**—The Franklin Mint Company and its principals, Stewart and Lynda Resnick (collectively, Franklin Mint), appeal from a judgment dismissing their malicious prosecution action against the law firm Manatt, Phelps & Phillips, LLP, and Attorney Mark S. Lee (collectively, Manatt). Manatt represented the executors of the estate of Diana, Princess of Wales and the trustees of The Diana, Princess of Wales Memorial Fund (collectively, the Fund) in a lawsuit filed against Franklin Mint alleging claims related to Franklin Mint's use of Princess Diana's name and image in connection with merchandise Franklin Mint advertised and sold. Franklin Mint's malicious prosecution claim is based upon two of the claims that were alleged in that underlying lawsuit, for false advertising and trademark dilution under the Lanham Act (15 U.S.C. § 1125(a), (c)). After a 17-day jury trial, the trial court granted Manatt's motion for nonsuit or directed verdict, finding that Manatt had probable cause to prosecute those claims.[1] We reverse.

We conclude that, based on the record before us, no reasonable attorney could find tenable the false advertising claim as it was alleged and litigated in the underlying action. Therefore, we hold there was no probable cause to prosecute that claim.

■ We also hold there was no probable cause to prosecute the trademark dilution claim because no reasonable attorney could conclude that the claim could satisfy two fundamental, long-standing principles of trademark law. First, to be protectable as a trademark,[2] a word, phrase, name, or symbol must be used in commerce to identify goods or services and their source. Although Manatt contends that Princess Diana used her name in connection with her appearances at charitable events, that use does not demonstrate trademark use. Second, a trademark that is descriptive—such as a personal name—must acquire secondary meaning to be protectable in a trademark dilution action. In other words, the primary meaning of the mark (i.e., the descriptive meaning) must in the minds of the public be subordinate to its meaning as the source of goods or services. Because "Diana, Princess of Wales" has such an extraordinarily strong primary meaning as descriptive of Princess Diana as a person, the contention that it had acquired secondary meaning at the time of the underlying lawsuit was, as the district court in the underlying lawsuit observed, "absurd." (*Cairns v. Franklin Mint Co.* (C.D.Cal. 2000) 107 F.Supp.2d 1212, 1222 (*Cairns III*).) Therefore, we conclude that the trademark dilution claim was untenable.

---

[1] Franklin Mint also sued the Fund for malicious prosecution of those claims; it settled with the Fund before trial. (See *Franklin Mint Co. v. Superior Court* (2005) 130 Cal.App.4th 1550 [31 Cal.Rptr.3d 319].)

[2] For simplicity, we use the term "trademark" to include a service mark.

Manatt argues, however, that we should not find that the claim lacked probable cause, because the issues are complex and there is no directly controlling authority. But the fundamental principles of trademark law—a trademark must identify a source of a product or service, and a descriptive mark such as a personal name must acquire secondary meaning in the minds of the public—were clear and well established, and their application to this case is straightforward and uncomplicated. The complexity of the issues arises only from Manatt's attempts to avoid those fundamental principles. Accordingly, we reverse the judgment and remand for trial on malice and damages issues.

## BACKGROUND

The parties' briefs on appeal contain extensive discussion of the factual background of this case, including many facts relevant only to the issue of malice. Because the only issue in this appeal is whether there was probable cause for the trademark dilution and false advertising claims, our discussion of the facts will be limited to those facts relevant to that issue.

A. *Events Leading up to the Underlying Lawsuit*

From the time of her engagement to Charles, Prince of Wales, in 1981, until her untimely death on August 31, 1997, Diana, Princess of Wales (Princess Diana) "was one of the most beloved, most photographed and most talked about celebrities" of the latter part of the 20th century. (*Cairns v. Franklin Mint Co.* (C.D.Cal. 1998) 24 F.Supp.2d 1013, 1021 (*Cairns I*).) During her lifetime, Franklin Mint, a direct mail marketer of collectible memorabilia, sold over $9 million of products related to Princess Diana.

Immediately after her death, Franklin Mint decided to design a line of products featuring Princess Diana, including one product from which all proceeds would be donated to charity in her honor. On September 5, 1997, the vice-president and general counsel of Franklin Mint, Howard Lucker, wrote to the trustees of The Diana, Princess of Wales Memorial Fund, which was a charitable trust established on September 4, 1997, at the direction of the executors of Princess Diana's estate, to receive contributions made in her memory. Lucker informed the trustees that Franklin Mint wanted to create and market a collectible porcelain plate in tribute to Princess Diana, from which all net proceeds would be donated to her favorite charities, and proposed that the Fund distribute those proceeds. Lucker stated that, if Franklin Mint and the Fund were able to come to an agreement quickly, Franklin Mint could advertise that it was officially authorized by the Fund and that all profits would be donated to the Fund.

The Fund did not immediately respond. Franklin Mint then decided that it would donate *all* proceeds from the tribute plate to charity. On September 9, 1997, Franklin Mint issued a press release stating that it was developing a tribute plate at its own expense and that all of the proceeds from the sale of the plate "will go directly to The Diana, Princess of Wales Charities." Five days later, it ran print advertisements for the tribute plate that featured a picture of the plate and stated, "All proceeds to go to Diana, Princess of Wales' Charities" and "100% of your purchase price will be donated to Diana, Princess of Wales' favorite charities." The Fund eventually declined Franklin Mint's proposal on October 31, 1997.

Because Franklin Mint wanted to "associate" its Princess Diana collectibles with donations to charities that supported causes that were important to her, and the Fund was not responsive to its proposal, Franklin Mint entered into an agreement with the Great Ormond Street Hospital for Children (a charity in England with which Princess Diana had been involved). Under that agreement, the charity allowed Franklin Mint to use its name in advertising Princess Diana collectibles in exchange for a promise by Franklin Mint to donate a minimum of £250,000 to the charity from sales of the tribute plate. Franklin Mint ultimately paid over $1.5 million to Great Ormond Street Hospital for Children from sales of the tribute plate outside the United States.

At some point, Franklin Mint stopped running advertisements for the tribute plate that included the "all proceeds" language, although it continued to advertise the tribute plate. Those later advertisements, as well as additional advertisements for other Princess Diana collectibles, instead included a statement that Franklin Mint had pledged a minimum of $1.5 million worldwide to charity in tribute to Princess Diana. Franklin Mint included a "response code" on all of its advertisements so it could track which purchases came from each advertisement. When a customer sent in the coupon at the bottom of the advertisement to purchase an item, the response code was printed on the coupon, and if the customer called Franklin Mint to order an item, the customer service representative asked for the response code; Franklin Mint sorted all purchases by response code. Using the response code, Franklin Mint was able to determine that the "all proceeds" tribute plate advertisement generated approximately $2.5 million in sales, and the tribute plate advertisement without the "all proceeds" language generated approximately $3.5 million in sales in the United States, and $3.5 million to $4 million in sales outside the United States ($1.5 million of which was paid to Great Ormond Street Hospital for Children). Franklin Mint eventually interpleaded with the district court in the underlying lawsuit $2,527,107, from sales attributable to the "all proceeds" advertisement, to be distributed to charity upon resolution of the lawsuit.

B. *The Underlying Lawsuit*

1. *Princess Diana's estate and the Fund retain United States attorneys*

By the middle of September 1997, Princess Diana's estate had retained an attorney in New York who specialized in intellectual property litigation, Paul LiCalsi, to advise it about intellectual property issues in the United States. The estate was aware of the advertisement for the tribute plate, which had run in The New York Times on September 16, 1997. It also was aware that, a few weeks before Princess Diana's death and in the weeks after, Franklin Mint had applied to the United States Patent and Trademark Office to register various trademarks related to its Princess Diana products, all of which used some form of Princess Diana's name or nicknames (such as "The People's Princess").[3] On September 19, 1997, LiCalsi advised the estate that a "cease and desist" letter should be sent to Franklin Mint, and a few days later he sent to the attorneys in England who represented the estate a draft of a proposed letter to Franklin Mint. That draft letter stated that Franklin Mint's use of Princess Diana's name and likeness in its advertisements "not only violate[s] many states' laws of publicity, but also violate[s] federal trademark law in that they are so orchestrated as to mislead the public that they were sponsored or approved by Princess Diana or her personal representatives." He did not send the letter because he was told that counsel for the Fund would take over that function.

The Fund had hired separate counsel in New York to represent its interests. On September 25, 1997, that attorney, Randy Lipsitz, sent a letter to counsel for Franklin Mint, stating that the Fund "owns the worldwide trademark rights concerning Princess Diana including, but not limited to the Diana, Princess of Wales and Diana, Princess of Wales Memorial Fund names and trademarks." The Fund then asked Lipsitz to consider whether litigation should be instituted against Franklin Mint. Lipsitz wrote to the Fund's English attorneys on October 14, 1997, recommending that litigation be commenced in California, with the estate as coplaintiff, asserting causes of action under Lanham Act section 43(a) for false designation of origin (15 U.S.C. § 1125(a)(1)(A)) and under section 43(c) for trademark dilution (15 U.S.C. § 1125(c)). He provided no legal analysis in the letter.

---

[3] Those applications were denied by the Patent and Trademark Office in December 1997 and January 1998. The examiner noted that the wording of the proposed trademarks were "commonly used designation[s] for the late Diana, Princess of Wales," and that the marks therefore refer to "a well-known individual," namely Princess Diana, and that a connection with her would be presumed by the public.

Institution of litigation was delayed, however, due to complications that arose regarding the transfer of Princess Diana's name and likeness rights from her estate to the Fund. Eventually, the estate granted exclusive licenses to the name and likeness rights in Princess Diana to the Fund. Those licenses were not approved by the Charities Commission in England and Wales until February 27, 1998.

### 2. *The Fund hires Manatt to file a lawsuit against Franklin Mint*

In the meantime, on October 9, 1997, defendant Lee wrote to English counsel for Princess Diana's estate. He introduced himself, and said that his office was representing Tiger Woods in litigation against Franklin Mint. He noted that during the course of that litigation, he discovered that Franklin Mint was planning to exploit Princess Diana's name and likeness. He said that Franklin Mint had applied for a trademark in the phrase "Diana, A Princess Forever" shortly before her death, and that it recently began advertising a "Commemorative Plate" featuring Princess Diana's name and image. He commented that "[t]he advertisement states that all proceeds from the sale will go to 'Diana, Princess of Wales' charities,' but based on our experience in the [Tiger Woods] litigation we are not confident this will actually occur." He explained that "there are several avenues available to Princess Diana's estate under U.S. laws" to prevent unauthorized commercial exploitation of her name and image, and mentioned that "legal theories of unfair competition and what is known as the 'right of publicity' provides significant remedies through litigation." He closed by inviting counsel to contact him if he could be of further assistance to the estate.

English counsel for the Fund contacted Lee sometime in early to mid-March 1998, and retained him in late March 1998 (sometime around Mar. 27, 1998) to conduct the litigation against Franklin Mint. Lee spoke by telephone with LiCalsi, the New York attorney representing Princess Diana's estate, a few times in late March, and faxed him a draft of the complaint on March 31. After receiving the draft complaint, LiCalsi spoke to Lee about certain issues, including the trademark dilution claim. LiCalsi asked Lee "about the issue of establishing secondary meaning for Princess Diana under trademark law," and specifically, "whether the fact that she had not been in commerce prior to her death, would that affect the secondary meaning issue." According to LiCalsi, Lee "indicated that there was substantial case law which supported using Princess Diana's very well-known charitable activities as a basis for establishing secondary meaning." LiCalsi relied upon Lee's statement as being accurate. He returned Lee's draft complaint to Lee with a few minor suggested changes.

### 3. *The complaint*

On May 18, 1998, Manatt, representing the Fund and the executors of Princess Diana's estate, filed the complaint in federal district court. The complaint alleged five causes of action against Franklin Mint, Roll International Corporation, Inc., and Stewart and Lynda Resnick:[4] (1) false designation of origin under the Lanham Act (15 U.S.C. § 1125(a)); (2) trademark dilution under the Lanham Act (15 U.S.C. § 1125(c)); (3) infringement of the California statutory right of publicity (Civ. Code, former § 990, amended and renumbered as Civ. Code, § 3344.1); (4) false advertising under the Lanham Act (15 U.S.C. § 1125(a)); and (5) unfair competition and false and misleading advertising under Business and Professions Code sections 17200 and 17500.

The complaint alleged that Princess Diana "was one of the best known and most widely admired public figures of the last half of the 20th century" and "for 16 years was the object of intensive public interest and media scrutiny." It went on to allege that "[a]s a member of the British Royal family and a tireless worker for charitable causes, Princess Diana's name, likeness and image have become uniquely identifiable throughout the United States and the world, have achieved extraordinary fame, are identified in the minds of the public as the source of the charitable activities which Princess Diana performed, and possess a valuable goodwill." The complaint alleged that after Princess Diana's death, "[h]er assets, including the rights to her name, likeness, image and marks, passed by will to the Estate," which granted exclusive licenses to Princess Diana's name and likenesses and the trademarks "Diana, Princess of Wales" and "Diana, Princess of Wales Memorial Fund" to the Fund. It asserted that, both before and immediately after her death, Franklin Mint filed applications for trademarks for Princess Diana's name, image, and phrases identified in the public's mind with Princess Diana, and used Princess Diana's name and image on products and in advertising. Finally, the complaint alleged that, by using Princess Diana's name and likeness on products and in advertising, Franklin Mint was falsely and misleadingly implying an endorsement, association, or affiliation with Princess Diana, her estate, and the Fund.

The false designation of origin (also known as false endorsement) cause of action simply incorporated all of the previous allegations and requested injunctive and monetary relief, destruction of infringing articles, treble damages, and cost and attorney fees.

The trademark dilution claim alleged that the Fund's "mark" was inherently distinctive and had acquired distinction "from its past use for charitable

---

[4] Roll International Corporation is a holding company that owns a number of operating companies, including Franklin Mint; the Resnicks own Roll International.

activities" such that Princess Diana's name and image had come to mean and be recognized as distinctive marks that identify the source of the charitable activities of Princess Diana. It alleged that "[the] marks including 'Diana Princess of Wales' and 'Diana Princess of Wales Memorial Fund' are famous and distinctive within the meaning of [the Lanham Act]" and that Franklin Mint's unauthorized use of those marks had caused and would continue to cause dilution of the Fund's marks.

The right of publicity claim alleged that Franklin Mint had willfully misappropriated the Fund's rights under Civil Code former section 990 (now Civ. Code, § 3344.1), causing the Fund irreparable harm.

The false advertising claim alleged that Franklin Mint had carried out "a large scale program of deceptive advertising" in which it made misleading and deceptive representations about the use of the proceeds from the sale of its products. It alleged that "[a]mong the false and misleading representations made by Defendants are, *inter alia*, that '100% of the . . . price [of Defendants' dolls and plates] will be donated to Diana, Princess of Wales' charities' and that 'all proceeds to go to Diana, Princess of Wales' Charities.' " (Original ellipsis & bracketed addition.) The claim asserted that those representations were false "in that Defendants have never donated a penny to the Fund," and that the Fund had been and would continue to be damaged by the false advertisements in that the advertisements attempt to benefit from the goodwill associated with Princess Diana's identity. The claim also included the following allegation: "As a result of Defendants' representations, members of the public are induced to purchase Defendants' dolls and plates in the mistaken belief that Defendants' products are endorsed by and/or associated or affiliated with Princess Diana, her Estate, and/or the Fund."

The state law unfair competition and false and misleading advertising claim basically repeated the previous claim's allegations regarding the false and misleading advertisements and sought injunctive relief.

### 4. *The right of publicity claim is dismissed and the remaining claims are disposed of on summary judgment*

Franklin Mint moved to dismiss each of the claims, and moved to strike certain inflammatory language referring to Franklin Mint and the other defendants as "vultures feeding on the dead"; the Fund moved for a preliminary injunction with respect to the false endorsement, false advertising, and trademark dilution claims. The district court granted Franklin Mint's motion to dismiss with respect to the right of publicity claim, on the ground that the law of Great Britain (which does not recognize a right of publicity) applied,

and granted the motion to strike the inflammatory language.[5] (*Cairns I, supra,* 24 F.Supp.2d at pp. 1022–1023.) The court denied the motion to dismiss the remaining claims and denied the motion for a preliminary injunction. (*Ibid.*)

With regard to the trademark dilution claim, the district court noted that a party alleging trademark dilution with respect to a personal name asserted as a mark must allege that the mark has acquired secondary meaning. The court observed that the Fund had made such an allegation, by alleging that Princess Diana's name and image had come to mean and be recognized as distinctive marks that identify the source of the charitable activities of Princess Diana. (*Cairns I, supra,* 24 F.Supp.2d at pp. 1034–1035.) Although the court indicated that "Diana, Princess of Wales has such a clear primary meaning as a description of the person herself that it seems unlikely that any secondary meaning could be acquired in her name, at least in the context of fund-raising for charitable services similar to those she was allegedly famous for endorsing," the court concluded that it was required to take the allegations as true on a motion to dismiss and therefore denied the motion as to the trademark dilution claim. (*Id.* at p. 1036.) The court also denied the Fund's motion for a preliminary injunction with respect to that claim, finding that the Fund did not show it had a fair chance of succeeding on the merits of the claim because the evidence presented did not suggest it could establish that Princess Diana's name or likeness had acquired secondary meaning. (*Id.* at p. 1044.)

With regard to the false advertising claim, the district court denied Franklin Mint's motion to dismiss because it found that the Fund had adequately alleged that Franklin Mint's advertisements falsely implied that it would donate proceeds to the Fund and/or that Princess Diana and the Fund endorsed Franklin Mint's products or advertisements. (*Cairns I, supra,* 24 F.Supp.2d at p. 1036.) But the court denied the Fund's motion for preliminary injunction on that claim because it found that the Fund did not provide sufficient evidence to support a finding that it had a fair chance of demonstrating the likelihood of confusion necessary to prove false endorsement, and because "neither the Court's reading of the advertisements nor the record before the Court supports [the Fund's] position . . ." that the advertisements falsely imply that proceeds would be donated to the Fund. (*Id.* at p. 1043.)

The Fund appealed the dismissal of the right of publicity claim and the denial of the motion for preliminary injunction. The Ninth Circuit affirmed the district court. (*The Diana Princess of Wales Memorial Fund v. Franklin Mint* (9th Cir., Feb. 24, 2000, Nos. 98-56722, 99-55157) 1999 WL 1278044.)

---

[5] The Fund sought to reinstate the right of publicity claim after the statute was amended. The district court denied the Fund's motion. (*Cairns v. Franklin Mint Co.* (C.D.Cal. 2000) 120 F.Supp.2d 880 (*Cairns II*).)

With respect to the trademark dilution claim, the circuit court stated: "The name 'Diana, Princess of Wales' has not acquired a secondary meaning such that it is synonymous in the public mind with charitable activities. [Citation.] While Princess Diana received a great deal of media attention for her charitable acts, she received equal if not greater attention for her status as a member of England's royal family, her divorce from Prince Charles, and her tragic death. Thus, the district court's finding that the Estate/Fund had failed to show a fair chance of success on their trademark dilution claim was not an abuse of discretion." (*Id.* at p. *4.) With respect to the false advertising claim, the circuit court noted that the Fund did not challenge the district court's holding regarding whether Franklin Mint's advertisements falsely implied that proceeds would be donated to the Fund. (*Id.* at p. *4, fn. 5.)

Franklin Mint subsequently moved for summary judgment, which the district court granted.[6] With regard to the trademark dilution claim, the court noted that the Fund was required to demonstrate that Diana, Princess of Wales had acquired secondary meaning as to charitable and humanitarian services. It observed, "[i]n this case, secondary meaning would occur when, 'in the minds of the public, the primary significance of a [mark]' identifies charitable and humanitarian services rather than Princess Diana the individual." (*Cairns III, supra,* 107 F.Supp.2d at p. 1222.) It continued: "Although Princess Diana is certainly well-recognized for her humanitarian work and fund-raising, she is undisputably also well-recognized for her status as a member of the royal family, her role as a mother, and her image as a fashionable princess. A finding of secondary meaning in this case would mean that the words 'Diana, Princess of Wales' would no longer primarily identify the individual, Princess Diana, but instead identify [the Fund's] charitable activities. This is an absurd contention to say the least. 'Diana, Princess of Wales' has not, and the Court suspects, will never, acquire a secondary meaning limited to charitable works. [Citation.] [¶] Because secondary meaning is required for an otherwise descriptive name to be 'famous,' and famousness is required for protection under 15 U.S.C. § 1125(c)(1), [Franklin Mint is] entitled to summary adjudication of [the Fund's] claim for dilution." (*Ibid.*)

In granting summary adjudication of the false advertising claim, the district court observed that the claim as alleged in the complaint—and as argued in opposition to Franklin Mint's motion for summary judgment—was based upon the assertion that advertisements saying that "all proceeds" or "100% of the proceeds" from sales of Franklin Mint products would go to charity were false because Franklin Mint "retained 'many times more from [its]

---

[6] Judge Richard A. Paez, who ruled on the motion to dismiss and motion for preliminary injunction, was appointed to the Ninth Circuit a few months before the motion for summary judgment was heard, and Judge Florence-Marie Cooper was assigned to the matter.

sales of Princess Diana merchandise than they have "pledged" to charity.' " (*Cairns III, supra*, 107 F.Supp.2d at p. 1223, quoting the Fund's opposition to Franklin Mint's motion for summary judgment.) The court also noted that only one of the advertisements before the court included the "all proceeds" or "100% of the proceeds" language—the advertisement for the tribute plate— and that uncontroverted evidence demonstrated that Franklin Mint contributed $1,538,640 to the Great Ormond Street Hospital for Children and had interpleaded another $2,527,107 with the court to be given to charity upon resolution of the lawsuit. In light of evidence that the amount of money given to charity reflected the amount of cash Franklin Mint collected from sales associated with that advertisement, the court concluded that undisputed evidence established that the "all proceeds" advertisement (which was the only advertisement the Fund pointed to) was literally true. (*Ibid.*)

### 5. *Franklin Mint is awarded attorney fees under the Lanham Act*

Franklin Mint moved for attorney fees under the Lanham Act.[7] In ruling on the motion, the district court noted that the Lanham Act permits an award of attorney fees to a prevailing party only " 'in exceptional circumstances,' " which " 'can be found when the non-prevailing party's case "is groundless, unreasonable, vexatious, or pursued in bad faith." ' " (*Cairns v. Franklin Mint Co.* (C.D.Cal. 2000) 115 F.Supp.2d 1185, 1187 (*Cairns IV*).) The court examined the three Lanham Act claims that the Fund alleged—false endorsement, trademark dilution, and false advertising—in light of this standard.

Addressing the false endorsement claim, the court observed that, "[a]l-though it is clear that this case was well outside the bounds of any previous decision, [the Fund's false endorsement] claim could be considered an attempt to extend existing law," and therefore did not "rise to the level of 'groundless, unreasonable, vexatious or bad faith.' " (*Cairns IV, supra*, 115 F.Supp.2d at p. 1188.) The court continued: "In contrast, [the Fund's] claims for dilution and false advertising were groundless and unreasonable. Unlike the endorsement claim which could be considered argument for an extension of existing law, the dilution claim had no legal basis." (*Ibid.*) The court noted that the dilution claim "was based on the 'absurd' contention that 'Diana, Princess of Wales' had taken on a meaning other than identification of an individual," and remarked that arguing that that name had acquired secondary meaning "falls just short of frivolous." (*Id.* at p. 1189.) The court also noted that the false advertising claim was groundless because the statements at issue were true, and the Fund presented no evidence to cast doubt on their veracity. The court concluded that the claim also was unreasonable because the Fund "should have either not brought the claim in

---

[7] Franklin Mint also moved for, and was awarded, attorney fees under Civil Code section 3344.1, subdivision (a)(1), as the prevailing party on the right of publicity claim.

the first instance, or voluntarily dismissed it when it was clear that there was no evidence to support it." (*Ibid.*)

Having found that the trademark dilution and false advertising claims were groundless and unreasonable, the district court awarded Franklin Mint $1,635,000 for defending those two claims.

> 6. *The judgment becomes final and Franklin Mint disburses the funds that had been interpleaded*

The Fund appealed from the denial of its motion to reinstate the right of publicity claim, the summary adjudication of the false endorsement claim, and the award of attorney fees. (*Cairns v. Franklin Mint Co.* (9th Cir. 2002) 292 F.3d 1139, 1144 (*Cairns V*).) The Ninth Circuit affirmed all three orders in June 2002. (*Id.* at p. 1159.)

At some point after the litigation was over, the $2.5 million that had been interpleaded with the district court was returned to Franklin Mint. Franklin Mint then distributed the money to several charities in the United States that Franklin Mint determined supported causes that Princess Diana had supported. Only one of those charities, however, had a direct connection with Princess Diana—The Breast Cancer Research Foundation, to which Princess Diana had donated a dress for a fund-raiser. Most of the remaining charities focused on medical issues or education and arts programs for underprivileged children or adults.

## C. *The Present Lawsuit*

On November 15, 2002, Franklin Mint filed the instant lawsuit against Manatt and the Fund, alleging a single cause of action for malicious prosecution of the trademark dilution and false advertising claims. Manatt moved for summary judgment on the ground that there was probable cause for both claims. The trial court (Hon. John P. Shook, presiding) denied the motion, declaring that neither claim was tenable.

With respect to the trademark dilution claim, the court found (1) that Manatt had "failed to produce any evidence that Princess Diana's name is inherently distinctive as opposed to descriptive of the person Princess Diana"; (2) that "[t]he name Diana, Princess of Wales has not acquired a secondary meaning attributable to her charitable activities"; and (3) that the items Manatt submitted to show "Princess Diana's name being used in conjunction with certain charity events . . . do not mention any services she provided." With respect to the false advertising claim, the court found that Manatt "provided no evidence [Franklin Mint] had misled a substantial segment of

its advertising audience regarding [Franklin Mint's] donation of proceeds to charity. The evidence presented [in the underlying lawsuit], of which [Manatt was] aware, was that [Franklin Mint] had donated a portion of the more than $4 million in sales to one of Princess Diana's favorite charities and had interpled the balance into district court. The evidence was uncontroverted then and remains so, even in this lawsuit."

The case went to trial before a different judge (Hon. Warren L. Ettinger). Both parties filed pretrial briefs on the issue of probable cause, in which Franklin Mint argued that the issue could be decided by the court based upon undisputed facts, while Manatt argued that there were factual issues that needed to be decided by the jury before the court could rule on probable cause. The case proceeded to jury trial, without a prior determination regarding probable cause. After Franklin Mint rested, Manatt filed a motion for nonsuit based on probable cause. The trial court did not rule on the motion at that time, and the jury trial continued. Shortly before the close of evidence, the court stated that it would allow Manatt to orally supplement the motion in order to consider it as a motion for a directed verdict.

The parties argued the issue of probable cause following the close of evidence. After extensive argument, the trial court stated its ruling: "[I]t seems to me that it is overwhelmingly clear that Mr. Lee had probable cause to bring his action and indeed confronted by a client seeking a remedy . . . and having consulted with other lawyers to determine whether or not that client's cause had merit, had he failed to file a cause of action, one would have had a serious question of whether or not he committed malpractice."

Based on its finding that there was probable cause to prosecute the underlying lawsuit, the court entered judgment in favor of Manatt. Franklin Mint timely filed a notice of appeal from the judgment.

## DISCUSSION

Franklin Mint contends the trial court improperly ruled that Manatt had probable cause to prosecute the trademark dilution and false advertising claims because (1) Manatt is bound by the district court rulings in the underlying case that those claims were "groundless and unreasonable"; (2) the Fund did not own a protectable trademark in Princess Diana's name or image; and (3) the Fund did not have standing to bring a false advertising claim and lacked evidence to show that the advertisements at issue were false.

### A. *Effect of District Court Rulings*

As noted above, the district court in the underlying case awarded Franklin Mint its attorney fees under the Lanham Act (15 U.S.C. § 1117(a)), finding

that the trademark dilution claim "had no legal basis" and that there was no reasonable basis to believe that the advertising at issue was false, and therefore both claims were "groundless and unreasonable." (*Cairns IV, supra,* 115 F.Supp.2d at pp. 1188–1189.) Franklin Mint argues that the district court's ruling establishes that there was no probable cause to prosecute those claims and that, under the principles of collateral estoppel, Manatt is barred from relitigating probable cause. Manatt contends that Franklin Mint failed to preserve the collateral estoppel issue on appeal because it failed to present evidence in the trial court to support its argument, failed to obtain a ruling on the issue, and expressly waived the issue during the hearing on probable cause in the trial court. Manatt is correct.

■ "[C]ollateral estoppel must be proved [in the trial court] or it is waived." (*Jordan v. Consolidated Mut. Ins. Co.* (1976) 59 Cal.App.3d 26, 45 [130 Cal.Rptr. 446].) Although Franklin Mint made references to the collateral estoppel effect of the district court rulings, it did not identify the elements of collateral estoppel, let alone attempt to apply the facts of the case to those elements.[8] Indeed, Franklin Mint never attempted in the trial court to submit evidence from the underlying proceedings to prove that the same issues were tried and determined in that action.[9] (See *Haun v. Hyman* (1963) 223 Cal.App.2d 615, 619 [36 Cal.Rptr. 84] ["a party relying upon the doctrine of collateral estoppel has the burden of proving that a particular issue was actually tried and determined in the prior action"].) In any event, Franklin Mint waived the issue during the hearing on the probable cause issue, by failing to argue that the district court decisions were binding on Manatt under collateral estoppel and instead stating that the district court "decisions are not binding on a state court." We note, however, that even though the district court rulings are not binding in this case, they nevertheless

---

[8] Those references consisted of (1) simply stating in its opposition to Manatt's motion for summary judgment and in its opposition to Manatt's motion in limine to exclude the opinions that the rulings "are res judicata" and citing generally to Witkin; (2) stating in its opposition to Manatt's pretrial brief on probable cause that "the Mint continues to respectfully suggest that **these findings** are law of the case via collateral estoppel. The doctrine of collateral estoppel 'operates as an estoppel or conclusive adjudication as to such issues as were actually litigated and determined in the first action' " (citing *Todhunter v. Smith* (1934) 219 Cal. 690, 695 [28 P.2d 916]); and (3) stating in its opposition to Manatt's motion for nonsuit that "these findings are **binding** on Manatt under the doctrine of collateral estoppel" (again citing *Todhunter*), acknowledging that Manatt had argued that it was not bound because its interests were not represented in the underlying lawsuit, and arguing that Manatt's subsequent admission that it was the representative of the plaintiffs in the underlying lawsuit establishes that Manatt is bound by the district court rulings.

[9] Franklin Mint did submit in this court those materials from the underlying lawsuit, and requested that we take judicial notice of them for the purpose of determining whether Manatt is collaterally estopped. We decline to do so, because they were not before the trial court. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [58 Cal.Rptr.2d 899, 926 P.2d 1085] [absent exceptional circumstances, appellate court will not judicially notice matters that were not presented to the trial court].)

can be considered as evidence relevant to the issue of probable cause. (*Mattel, Inc. v. Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179, 1191 [121 Cal.Rptr.2d 794].)

### B. *Probable Cause in a Malicious Prosecution Case*

█ To establish a cause of action for malicious prosecution, a plaintiff must prove that the underlying action was (1) terminated in the plaintiff's favor, (2) prosecuted without probable cause, and (3) initiated with malice. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 966, 973 [12 Cal.Rptr.3d 54, 87 P.3d 802].) A claim for malicious prosecution need not be addressed to an entire lawsuit; it may, as in this case, be based upon only some of the causes of action alleged in the underlying lawsuit. (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 57 [118 Cal.Rptr. 184, 529 P.2d 608] ["We see no reason for permitting plaintiffs . . . to pursue shotgun tactics by proceeding on counts and theories which they know or should know to be groundless."]; see also *Crowley v. Katleman* (1994) 8 Cal.4th 666 [34 Cal.Rptr.2d 386, 881 P.2d 1083] [reaffirming *Bertero*].) In this appeal, we are concerned only with the second element, i.e., whether there was probable cause to prosecute the claims for trademark dilution and false advertising.

█ The existence or absence of probable cause is a question of law to be determined by the court from the facts established in the case. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 875 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel*).) "The question whether, on a given set of facts, there was probable cause to institute an action requires a sensitive evaluation of legal principles and precedents . . . ." (*Ibid.*) This is because " '[c]ounsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . .' " (*Id.* at p. 885.) Thus, the court "must properly take into account the evolutionary potential of legal principles" and determine, in light of the facts known to counsel, "whether any reasonable attorney would have thought the claim tenable." (*Id.* at p. 886; see also *Leonardini v. Shell Oil Co.* (1989) 216 Cal.App.3d 547, 568 [264 Cal.Rptr. 883] ["A litigant will lack probable cause for his action if he relies upon facts which he has no reasonable cause to believe to be true, or seeks recovery upon a legal theory which is untenable under the facts known to him."].) This is an objective standard, and does not take into account the subjective mental state of the defendant; if the underlying claims were objectively tenable, the malicious prosecution claim fails, regardless of any evidence of malice on the part of the defendant. (*Sheldon Appel, supra,* 47 Cal.3d at p. 878.)

With this objective standard in mind, we examine the trademark dilution and false advertising claims in light of relevant legal principles and precedents and the relevant facts.

C. *There Was No Probable Cause to Prosecute the Trademark Dilution Claim*

■ The trademark dilution claim at issue here was alleged under the Federal Trademark Dilution Act of 1995, which provided in relevant part: "The owner of a famous mark shall be entitled . . . to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark . . . ." (15 U.S.C. former § 1125(c)(1); Pub.L. No. 104-98, § 3(a), 109 Stat. 985.) To prove a dilution claim a plaintiff must show that he or she owns a mark, and that "(1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services." (*Panavision Internat., L.P. v. Toeppen* (9th Cir. 1998) 141 F.3d 1316, 1324.)

Franklin Mint contends that Manatt lacked probable cause to prosecute a trademark dilution claim against it because the Fund had no plausible claim that Princess Diana used her name or image as a trademark (which passed to the Fund after her death),[10] but even if Princess Diana did use her name or image as a trademark, no reasonable attorney would argue that "Diana, Princess of Wales" or Princess Diana's likeness had acquired the secondary meaning necessary to qualify for protection under the Federal Trademark Dilution Act of 1995. We agree.

1. *There is no legally tenable argument that Princess Diana used "Diana, Princess of Wales" as a trademark*

■ The Lanham Act defines a trademark or service mark as a "word, name, symbol, or device, or any combination thereof" that is used by a person "to identify and distinguish" that person's goods or services from the goods or services of others and to indicate the source of the goods or services. (15 U.S.C. § 1127.) "Implicit in this statutory definition is a requirement that there be a direct association between the mark . . . and the services specified in the application, i.e., that it be used in such a manner that it would be readily perceived as identifying such services." (*In re Moody's*

---

[10] In the underlying lawsuit, the Fund alleged that Princess Diana owned a trademark in her name and likeness during her lifetime, and the trademark was passed to her estate (which licensed it to the Fund) after she died. Therefore, our analysis is limited to that alleged trademark. It may well be that the Fund has, in the 12 years since the underlying lawsuit was filed (or 10 years since judgment was entered), acquired a valid trademark with regard to Princess Diana's name or likeness in connection with the Fund's charitable activities, but any such trademark has no bearing on this case.

*Investors Service, Inc.* (T.T.A.B. 1989) 13 U.S.P.Q.2d 2043, 2047; accord, *Self-Realization Fellowship Church v. Ananda* (9th Cir. 1995) 59 F.3d 902, 906–907.)

Manatt contends that the mark at issue—Princess Diana's name and likeness—qualifies as a trademark because it was used on promotional materials to inform the public that she would perform a service. Manatt identifies that service as "promoting charities through personal appearances."

Initially, a question arises whether simply making personal appearances is a cognizable service under the Lanham Act. In its respondent's brief, Manatt seems to assume it is, and compares Princess Diana's use of her name to promote her appearances to Johnny Carson's and Elvis Presley's use of their names to "promote [their] appearance" at clubs or concerts. But Johnny Carson and Elvis Presley obtained trademarks in their names (see *In re Carson* (T.T.A.B. 1977) 197 U.S.P.Q. 554; *Estate of Presley v. Russen* (D.N.J. 1981) 513 F.Supp. 1339), not because they used their names in conjunction with merely appearing at certain venues, but because they used their names "in close association with a clear reference . . . *to entertainment services*" they provided at those venues. (*Estate of Presley v. Russen, supra*, 513 F.Supp. at p. 1363, italics added.) Indeed, Carson's initial application to register his name as a service mark failed because he did not show that he used his name with a clear reference to the services he performed: the specimens he filed to show use of the name "JOHNNY CARSON" as a service mark were copies of a page from a newspaper showing his picture and the words " 'JOHNNY CARSON is in the Congo Room at Del Webb's hotel Sahara with Bette Midler.' " The Examiner of Trademarks rejected those specimens because they contained no reference to the services to be performed, even though they clearly referred to his appearance in the Congo Room. (*In re Carson, supra*, 197 U.S.P.Q. at p. 555.) Carson succeeded in registering his service mark only after he submitted additional specimens that used the mark in connection with the words " 'IN CONCERT.' " (*Ibid.*)

Thus, it is not enough for a person to use his or her name or likeness in connection with simply making appearances. That person may obtain a trademark only if his or her name or likeness was used *as a trademark*—in other words, it was being used "in such a manner that it would be readily perceived as identifying . . . services." (*In re Moody's Investors Service, Inc., supra*, 13 U.S.P.Q.2d at p. 2047.) As the Trademark Trial and Appeal Board explained in *In re Carson*, "the name of an individual may function not only to identify the individual but also as a trademark or service mark to identify goods sold or services rendered by the individual . . . in commerce," but to qualify as a trademark, there must be evidence of "use of the name not just to identify the individual but rather to identify goods sold or services rendered

by the applicant in commerce." (*In re Carson, supra*, 197 U.S.P.Q. at p. 555, citing *In re Lee Trevino Enterprises, Inc.* (T.T.A.B. 1974) 182 U.S.P.Q. 253 [application to register "LEE TREVINO" as a service mark for promoting goods or services of others by means of endorsements, golfing exhibitions, and personal appearances by golfer Lee Trevino was denied because the name was not set off in a service mark manner but rather was used as part of a textual reference to Lee Trevino as an individual].)

Here, there is no dispute that Princess Diana supported many charities and promoted them through personal appearances. But the question that must be answered is, is there a tenable argument that she used her name and likeness *as a trademark* in connection with providing services? The judge who denied Manatt's motion for summary judgment on the probable cause issue (a different judge than the judge who presided over the trial) indicated that she did not, when he observed that the items Manatt submitted in support of its motion, purportedly to demonstrate Princess Diana's use of her name in connection with charitable events, "*do not mention any services she provided.*"[11] (Italics added.) And while Manatt asserts that Princess Diana exercised significant control over the use of her name and image in connection with her appearances at charitable events or promotion of charities, that fact is not particularly relevant here.[12] Under *In re Lee Trevino Enterprises, Inc., supra*, 182 U.S.P.Q. 253, if Princess Diana's name was used only as part of a textual reference to Princess Diana as an individual (i.e., that she would be appearing at, or supporting, a charitable event), even if Princess Diana exercised significant control over that use of her name, her name was not used in a service mark manner and therefore did not qualify as a trademark. Given Manatt's own description of the purported services Princess Diana provided—"promoting charities through personal appearances"—we cannot conclude that "any reasonable attorney would have thought" a tenable legal argument could be made that Princess Diana used her name or likeness as a trademark. (*Sheldon Appel, supra*, 47 Cal.3d at p. 886.)

2. *There was no tenable argument that "Diana, Princess of Wales" acquired secondary meaning*

■ A trademark may be protected under the common law or the Lanham Act if it is either inherently distinctive or has acquired distinctiveness. (*Two*

---

[11] Because the record on appeal does not include all of the documents submitted in support of (or opposition to) the summary judgment motion, we cannot verify the trial court's observation.

[12] We note that the evidence Manatt cites in support of this assertion—the declaration of the comptroller to Princess Diana's household—was hearsay admitted only for a limited purpose (attorney state of mind), and not for the truth of the matter asserted. In any event, there was evidence admitted that appeared to contradict that declaration.

*Pesos, Inc. v. Taco Cabana, Inc.* (1992) 505 U.S. 763, 769 [120 L.Ed.2d 615, 112 S.Ct. 2753].) Inherently distinctive trademarks—such as fanciful, arbitrary, or suggestive words and symbols—are protected "because their intrinsic nature serves to identify a particular source of a product [or service]." (*Id.* at p. 768.) But trademarks that are not inherently distinctive—such as descriptive words or symbols—are protected only if they have acquired secondary meaning, i.e., they " 'h[ave] become distinctive of the [owners'] goods [or services] in commerce.' " (*Id.* at p. 769.) Generally, "personal names are regarded as in the same category as descriptive terms" and "are placed by the common law into that category of noninherently distinctive terms which require proof of secondary meaning for protection." (2 McCarthy, Trademarks and Unfair Competition (4th ed. 2010) § 13:2, p. 13-3 (McCarthy); see also *Lane Capital Management v. Lane Capital Management* (2d Cir. 1999) 192 F.3d 337, 345; *Pirone v. MacMillan, Inc.* (2d Cir. 1990) 894 F.2d 579, 583; *Cairns I, supra,* 24 F.Supp.2d at p. 1034; 4 Callmann, Unfair Competition, Trademarks and Monopolies (4th ed. 2009) § 22:42, pp. 22-549 to 22-550 (Callmann).)[13]

▪ Franklin Mint contends that, to establish secondary meaning, Manatt (in representing the Fund) was required to show that Princess Diana's name or image "no longer describe[d her as an] individual but instead refer[red] to

---

[13] After oral argument in this appeal, Manatt brought to our attention a recent decision of the Trademark Trial and Appeal Board (TTAB) of the United States Patent and Trademark Office, which Manatt contends is relevant to the issue of secondary meaning in this case. That decision, *Brooks v. Creative Arts by Calloway LLC* (T.T.A.B. 2010) 93 U.S.P.Q.2d 1823, does not assist Manatt. First, the decision confirms that a personal name does not qualify as a trademark unless "the record shows that it is used in a manner that would be perceived by purchasers as identifying the services in addition to the person." (*Id.* at p. 1829.) Second, although the decision states that a personal name when used in the trademark sense is deemed inherently distinctive, it does so *in the context of discussing whether it is registrable on the Principal Register* without a showing of secondary meaning. The TTAB noted that it had determined as early as 1949, shortly after the Lanham Act replaced the Trade Mark Act of 1905, that "while surnames continue to require a showing of secondary meaning under the Lanham Act [for purposes of registration of trademarks], personal or full names do not." (*Ibid.*) This is due to a change in the language governing registration; the 1905 Act generally prohibited registration of a mark that " ' "consists merely of the name of an individual," ' " while the Lanham Act prohibits registration only if the mark " ' "is primarily merely a surname" ' " and does not have secondary meaning. (*Brooks, supra,* at pp. 1829–1830, quoting *Ex Parte Dallioux* (Comr. Patents 1949) 83 U.S.P.Q. 262, 263.) Despite this "settled interpretation of the [registration] statute, followed by the USPTO for over 50 years, that personal name marks are inherently distinctive under the Lanham Act" (*Brooks,* at p. 1830), the TTAB acknowledged that a different rule applies in cases involving trademark protection based upon use rather than registration of the mark. In such cases, the TTAB noted there is a "general requirement that secondary meaning be shown for a personal name, for such name to be protectible." (*Id.* at p. 1829, fn. 4.) In short, this recent TTAB decision, which reiterates a 50-year-old rule governing the registration of personal names as trademarks, does not change the equally well-settled rule that a personal name that has *not* been registered is not protectable as a trademark without a showing of secondary meaning.

goods or services" she provided. It overstates the test somewhat. The Fund was not required to show that "Diana, Princess of Wales" no longer described Princess Diana as an individual. A trademark's primary meaning does not need to *disappear* for the mark to acquire secondary meaning. (See 2 McCarthy, *supra*, § 15:1, p. 15-5.) But the mark's primary (i.e., descriptive) meaning must be subordinate to its secondary meaning as an indicator of the source of goods or services. (See, e.g., Callmann, *supra*, § 22:42, p. 22-550 [where a name is used in connection with goods or services, "[n]o protection will be available if the name is merely descriptive; [fn. omitted] it may, however, enjoy trademark protection if its primary meaning is less significant than a secondary meaning it may have acquired"].)

The United States Supreme Court has explained that secondary meaning "occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.' " (*Wal-Mart Stores, Inc. v. Samara Brothers Inc.* (2000) 529 U.S. 205, 211 [146 L.Ed.2d 182, 120 S.Ct. 1339] (*Wal-Mart*), quoting *Inwood Laboratories v. Ives Laboratories* (1982) 456 U.S. 844, 851, fn. 11 [72 L.Ed.2d 606, 102 S.Ct. 2182].) Thus, in the underlying lawsuit here, the district court, relying upon *Wal-Mart*, stated: "In this case, secondary meaning would occur when, 'in the minds of the public, the primary significance of a [mark]' identifies charitable and humanitarian services rather than Princess Diana the individual." (*Cairns III, supra*, 107 F.Supp.2d at p. 1222.)

Manatt argues that the district court was incorrect in its application of *Wal-Mart*. According to Manatt, even if the *Wal-Mart* language applies, the proper interpretation would be that "the Fund would have to show that the primary significance was to identify the *source* of the services rather than the *services themselves*." Manatt's assertion is belied by the footnote immediately following the quotation in Wal-Mart. (*Wal-Mart, supra*, 529 U.S. at p. 211, fn. *.) In that footnote, the Supreme Court explained that the phrase "secondary meaning" originally arose in the context of word marks "to distinguish the source-identifying meaning from the ordinary, or 'primary,' meaning of the word." (*Ibid.*) Thus, the district court in the underlying case here correctly understood that, to prove secondary meaning, the Fund would have to show that the primary significance of "Diana, Princess of Wales" in the minds of the public was to the charitable services performed by Princess Diana (the source-identifying meaning) rather than to Princess Diana as an individual (the primary meaning of the words).

Manatt maintains, however, that the correct test for a celebrity's name or image used as a trademark is found in cases such as *Estate of Presley v. Russen, supra*, 513 F.Supp. at page 1363, and *Miller v. Glenn Miller Productions, Inc.* (9th Cir. 2006) 454 F.3d 975, 991–992, where secondary

meaning is found in a person's name through use of the name in connection with entertainment services, even if the name continues to refer to the person. (Manatt also cites to *In re Carson, supra*, 197 U.S.P.Q. at p. 555 and *Prudhomme v. Proctor & Gamble Co.* (E.D.La. 1992) 800 F.Supp. 390, 394, involving celebrity chef Paul Prudhomme's likeness, in support of its contention.) Manatt interprets those cases as standing for the proposition that Princess Diana could acquire a trademark in her name simply by using her name to promote her charitable appearances, without showing that her name no longer primarily referred to her as a person. That interpretation is untenable. First, as discussed in part C.1., *ante*, it is not sufficient for trademark purposes that Princess Diana's name was used in the promotion of charity events as part of a textual reference to Princess Diana as an individual; the term "Diana, Princess of Wales" had to be used in a trademark sense, to identify services that were being performed. (*In re Carson, supra*, 197 U.S.P.Q. 554; *In re Lee Trevino Enterprises, Inc., supra*, 182 U.S.P.Q. 253.)

But more importantly, there is a critical distinction between the celebrity cases and the case of Princess Diana. Elvis Presley, Glenn Miller, Johnny Carson, and chef Paul Prudhomme achieved public name (or image) recognition *in connection with their provision of services*. Princess Diana did not. Thus, although the "primary meaning" of the celebrities' names (or images) was to describe them as individuals, the public did not know their names or images except through their services, i.e., in the "secondary meaning" sense. In contrast, the public knew Princess Diana's name and image, and came to strongly associate "Diana, Princess of Wales" with the person (the "primary meaning"), long before she became associated with charitable work. Therefore, unlike the previously unknown celebrities, whose names did not have a strong "primary meaning" to overcome in the mind of the public and could achieve secondary meaning simply by promoting their names in association with the entertainment services they provided, Princess Diana's name had such an extraordinarily strong "primary meaning" it is doubtful that the words "Diana, Princess of Wales" could ever overcome that "primary meaning."

In short, given the enormously widespread use of Princess Diana's name and likeness to identify Princess Diana as an individual—Manatt itself described her in the underlying complaint as "one of the best known and most widely admired public figures of the last half of the 20th century" who "for 16 years was the object of intensive public interest and media scrutiny"—no reasonable attorney would contend, especially in the immediate aftermath of her death, that the primary significance of "Diana, Princess of Wales" was to identify the provider of charitable services rather than to

identify Princess Diana herself.[14] Thus, there was no probable cause to allege that "Diana, Princess of Wales" had acquired secondary meaning—a basic requirement for trademark protection of a descriptive personal name.

### 3. *Manatt's argument that the Fund did not need to prove secondary meaning ignores basic trademark law*

Manatt argues that the general rule requiring proof of secondary meaning does not apply in this case because (a) "Diana, Princess of Wales" is inherently distinctive inasmuch as it identifies only one specific person, and therefore designates a single source; and (b) celebrity endorsement cases do not require secondary meaning when affording protection to a celebrity's "persona" under the false designation of origin provision of the Lanham Act. As with Manatt's other attempts to avoid well-established trademark law, neither argument is tenable. Moreover, even if Manatt were correct the Fund was not required to show secondary meaning to prove ownership of a protectable trademark, proof of secondary meaning nevertheless was required to establish that the alleged trademark met the requirements of a claim for trademark dilution.

### a. *Inherent Distinctiveness*

In making the argument that "Diana, Princess of Wales" is inherently distinctive, Manatt correctly observes that inherently distinctive marks are those that uniquely identify a particular source of goods or services and therefore do not require a showing of secondary meaning. Because "Diana, Princess of Wales" can refer only to a single person, Manatt posits, it identifies a single source, and therefore is an inherently distinctive mark. But Manatt's postulation focuses only on the "source designation" aspect of trademark and completely ignores the companion aspect, that the trademark must designate the source of *goods or services*. In doing so, Manatt overlooks a significant reason why personal name marks generally are considered a subset of descriptive marks: a personal name usually is understood to refer to a *person* rather than a provider of goods or services. (See *Abdul-Jabbar v. General Motors Corp.* (9th Cir. 1996) 85 F.3d 407, 412 ["an individual's given name, unlike a trademark, has a life and a significance quite apart from the commercial realm"]; see also *Pirone v. MacMillan, Inc., supra*, 894 F.2d at p. 583 ["Personal names used as trademarks are generally treated as descriptive terms, since a name might be regarded as a convenient description of the fact that the individual was affiliated with the firm."].)

---

[14] We emphasize that we do not determine whether "Diana, Princess of Wales Memorial Fund" can, or has, acquired secondary meaning. While it is possible that "Diana, Princess of Wales Memorial Fund" has acquired secondary meaning in the more than 12 years since her death, there is a significant difference in terms of public recognition between "Diana, Princess of Wales" standing alone and "Diana, Princess of Wales Memorial Fund."

Indeed, the fact that "Diana, Princess of Wales" can refer only to a single person ("one of the best known and most widely admired public figures of the last half of the 20th century," according to the complaint Manatt filed in the underlying lawsuit) makes that term extraordinarily descriptive. The descriptive nature of the term is precisely why the case on which Manatt relies to support its assertion that the term is inherently distinctive is inapplicable.

In that case, *Peaceable Planet, Inc. v. Ty, Inc.* (7th Cir. 2004) 362 F.3d 986, the maker of a toy stuffed camel it named "Niles" sued a competitor for trademark infringement and false advertising after the competitor started marketing its own toy stuffed camel named "Niles." The district court ruled that the original maker did not have a protectable trademark in the name "Niles" because it was a personal name and the maker had not shown secondary meaning. (*Id.* at p. 988.) The Seventh Circuit reversed. The appellate court found that the rule that personal name marks require secondary meaning did not apply because the name "Niles" was not descriptive of a toy camel, and its use for a toy camel did not trigger any of the reasons the court identified for applying the personal name rule. (*Id.* at pp. 989 [discussing three concerns that are reflected in the personal name rule], 990–991 [noting that " 'Niles,' at least when affixed to a toy camel, is a suggestive mark . . . rather than . . . a descriptive mark."].) In short, the court concluded that "the 'rule' does not apply if the public is unlikely to understand the personal name as a personal name." (*Id.* at p. 990.) The court conceded, however, that "[i]f people were asked what came to mind when they saw the word 'Niles' and they said a camel, there would be an argument that 'Niles' was a descriptive mark . . . ," which would require secondary meaning to be protectable as a trademark. (*Id.* at p. 992.)

In this case, there is little question that if people were asked what came to mind when they saw the words "Diana, Princess of Wales," they would say a person, Princess Diana (particularly in the months or first few years after her death, when the underlying lawsuit was being prosecuted). That those words can refer only to a *single* person does not make them inherently distinctive in the trademark protection sense. They remain descriptive for the purposes of trademark protection because they refer to a person, albeit a specific person, and thus require proof of secondary meaning to be protected as a trademark. No reasonable attorney, possessing a reasonable understanding of basic trademark law, would contend otherwise.

b. *Celebrity Endorsement Cases*

As further support for its assertion that proof of secondary meaning is not required in this case, Manatt relies upon several cases in which celebrities

successfully sought protection under section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) from the misuse by others of their names or other attributes, without having to prove secondary meaning. (E.g., *White v. Samsung Electronics America, Inc.* (9th Cir. 1992) 971 F.2d 1395; *Waits v. Frito-Lay, Inc.* (9th Cir. 1992) 978 F.2d 1093; *Wendt v. Host Internat., Inc.* (9th Cir. 1997) 125 F.3d 806; *Downing v. Abercrombie & Fitch* (9th Cir. 2001) 265 F.3d 994.)[15] Manatt asserts that, because the courts in those cases referred to the celebrity's name, persona, or other attribute as a "mark" without discussing secondary meaning, the cases stand for the proposition that no secondary meaning is required to find a trademark in a celebrity's name. The cases do no such thing.

A plaintiff bringing a claim under section 43(a) of the Lanham Act (15 U.S.C. § 1125(a))—*unlike a plaintiff bringing a trademark dilution claim under section 43(c)* (15 U.S.C. § 1125(c))—is not required to prove that he or she has a valid trademark. Rather, the plaintiff must show that the defendant's use in commerce of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" in connection with the *defendant's* goods or services "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of the defendant with the plaintiff, "or as to the origin, sponsorship, or approval" of defendant's goods or services by the plaintiff. (15 U.S.C. § 1125(a)(1).) In other words, if the defendant uses a name, symbol, or device in connection with his or her goods or services that is likely to cause confusion as to the defendant's association with the plaintiff, or confusion as to whether the defendant's goods or services were originated, sponsored, or approved by the plaintiff, the defendant is liable to the plaintiff for damages. While the terms used in the statute—"any word, term, name, symbol, or device" used "in connection with any goods or services" (*ibid.*)—are similar to the definition of "trademark" in the Lanham Act, those terms relate to *defendant's* use, not plaintiff's. A plaintiff is entitled to relief under an endorsement claim regardless of whether the plaintiff owns a trademark.

Manatt is correct that the courts referred to the celebrities' "marks" when determining whether the celebrities could recover damages under the Lanham Act. But the courts did so not because the celebrities' names or other attributes constituted trademarks, but simply because each case transplanted the "likelihood of confusion" test from a trademark infringement case to determine whether the celebrity established that the defendant's use of an

---

[15] Manatt also cited to another celebrity endorsement case, *Newton v. Thomason* (9th Cir. 1994) 22 F.3d 1455, in which the court applied the same analysis as the others, but the celebrity was unsuccessful in his lawsuit because his name recognition was weak. (*Id.* at p. 1462.)

image, voice, or name was likely to mislead consumers to associate the defendant's product with the celebrity. (*White v. Samsung Electronics America, Inc., supra*, 971 F.2d at p. 1400; *Newton v. Thomason, supra*, 22 F.3d at p. 1462; *Wendt v. Host Internat., Inc., supra*, 125 F.3d at p. 812; *Downing v. Abercrombie & Fitch, supra*, 265 F.3d at p. 1007.) And that "likelihood of confusion" test, because it was formulated for trademark infringement claims, naturally used the term "mark": the test required examination of "(1) strength of the plaintiff's mark; [¶] (2) relatedness of the goods; [¶] (3) similarity of the marks; [¶] (4) evidence of actual confusion; [¶] (5) marketing channels used; [¶] (6) likely degree of purchaser care; [¶] (7) defendant's intent in selecting the mark; [¶] [and] (8) likelihood of expansion of the product lines." (*White v. Samsung Electronics America, Inc., supra*, 971 F.2d at p. 1400.)

Because the language used in the trademark infringement test did not make much sense in the context of a celebrity endorsement case, some of the courts explained that "mark" as used in the test means the celebrity's "persona" and "strength of the mark" refers to the level of recognition the celebrity has in society. (*White v. Samsung Electronics America, Inc., supra*, 971 F.2d 1395 at p. 1400; *Newton v. Thomason, supra*, 22 F.3d at p. 1462; *Wendt v. Host Internat., Inc., supra*, 125 F.3d at p. 812, fn. 1.) But in doing so, the courts did not conduct any analysis to determine whether the celebrity did, in fact, possess a trademark in his or her "persona"; they merely used "mark" as shorthand. In fact, the court in *Downing v. Abercrombie & Fitch*, recognizing that the wording of the trademark infringement likelihood of confusion test was somewhat awkward in the context of celebrity endorsement cases, restated the trademark infringement test to make it more clear. The newly worded factors are: (1) the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended; (2) the relatedness of the fame or success of the plaintiff to the defendant's product; (3) the similarity of the likeness used by the defendant to the actual plaintiff; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the defendant's intent on selecting the plaintiff; and (8) likelihood of expansion of the product lines. (*Downing v. Abercrombie & Fitch, supra*, 265 F.3d at pp. 1007–1008.) Thus, some courts' use of the term "mark" when referring to the celebrity's persona in the context of a false endorsement case does not support Manatt's argument that a celebrity does not have to prove secondary meaning to establish the existence of a trademark in the celebrity's name, image, or other attribute. To the contrary, Manatt's reliance on the celebrity endorsement cases reflects a fundamentally distorted view of the Lanham Act.

### c. *Secondary Meaning and Dilution Claims*

Aside from Manatt's unreasonable reliance on celebrity endorsement cases, its argument that the Fund did not have to prove secondary meaning to

establish ownership of a trademark in Princess Diana's name or likeness ignores the requirements of a trademark dilution claim. When asserting such a claim, it is not enough to simply own a trademark. Instead, the plaintiff must establish that the trademark is both distinctive (the requirement to prove ownership) and famous. As the Ninth Circuit has explained, "[d]ilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value. [Citations.] Dilution causes of action, much more so than infringement and unfair competition laws, tread very close to granting 'rights in gross' in a trademark. [Citation.] In the infringement and unfair competition scenario, where the less famous a trademark, the less the chance that consumers will be confused as to origin [citation], a carefully-crafted balance exists between protecting a trademark and permitting non-infringing uses. In the dilution context, likelihood of confusion is irrelevant. [Citations.] If dilution protection were accorded to trademarks based only on a showing of inherent or acquired distinctiveness, we would upset the balance in favor of over-protecting trademarks, at the expense of potential non-infringing uses. [Citation.] [¶] We view the famousness prong of both dilution analyses [(i.e., under federal law and Cal. law)] as reinstating the balance—by carefully limiting the class of trademarks eligible for dilution protection, Congress and state legislatures granted the most potent form of trademark protection in a manner designed to minimize undue impact on other uses. [Citation.] [¶] Therefore, to meet the 'famousness' element of protection under the dilution statutes, ' "a mark [must] be truly prominent and renowned." ' [Citation.]" (*Avery Dennison Corp. v. Sumpton* (9th Cir. 1999) 189 F.3d 868, 875.)

■ Thus, even if Manatt were correct that "Diana, Princess of Wales" was inherently distinctive in the trademark sense, that fact alone is not sufficient to seek protection under the dilution statute. "Acquired distinctiveness is the essential ingredient in the determination of fame, within the meaning of the statute. The statute's requirement of fame is not satisfied by any kind of fame. The mark must have become famous *as the designator of the plaintiff's goods or services.* A merchant's taking a famous name— Shakespeare or Zeus—as the mark for its product would not thereby satisfy the statute's requirement of fame. It is true, such a mark would be famous in the sense that universal recognition would attach to the name Shakespeare or Zeus. To satisfy the statute, however, the mark must be famous in its capacity as a mark designating the plaintiff's goods." (*TCPIP Holding Co. v. Haar Communications* (2d Cir. 2001) 244 F.3d 88, 97;[16] see also 4 McCarthy,

---

[16] We acknowledge that the holding in *TCPIP Holding Co. v. Haar Communications, supra,* 244 F.3d 88, that only trademarks that are inherently distinctive are eligible for dilution claims (assuming, of course, that the trademark is also famous) (*id.* at p. 96), has not been followed by other circuits. (See, e.g., *Avery Dennison Corp. v. Sumpton, supra,* 189 F.3d at p. 877.) That

*supra*, § 24:104, p. 24-292 ["To be capable of being diluted, a designation must have a significant degree of 'strength' beyond the minimum threshold of 'distinctiveness' that is needed to serve as a trademark in the first place. This is certainly true of the status of marks that are inherently distinctive. Inherent distinctiveness or the acquisition of secondary meaning merely establishes the minimum threshold necessary for trademark status: section 43(c) requires a great deal more." (Fns. omitted.)].)

In short, to prevail on its dilution claim, the Fund would have had to show not only that "Diana, Princess of Wales" was inherently distinctive because it can relate to only one source, but also that it was famous *as a designator of Princess Diana's services*. Princess Diana's personal fame as an individual is not the relevant issue. Instead, the Fund would have to show that "Diana, Princess of Wales" had achieved significant fame as the designator of Princess Diana's charitable services rather than simply referring to Princess Diana herself. In other words, the Fund would have to establish secondary meaning.[17] Manatt's argument to the contrary is not tenable.

4. *Despite the complexity of Manatt's attempts to avoid them, application of fundamental principles of trademark law to the facts of this case show there was no probable cause to prosecute the trademark dilution claim*

In arguing in support of the trial court's finding of probable cause, Manatt observes that under the standard for frivolous appeals, which the Supreme Court in *Sheldon Appel* found applicable to the probable cause determination (*Sheldon Appel, supra*, 47 Cal.3d at pp. 885–886), a claim is tenable if it " ' " 'presents a unique issue which is not "indisputably" without merit' . . . , involves facts which are 'not amenable to easy analysis in terms of existing law' . . . , or makes a reasoned 'argument for the extension, modification, or reversal of existing law.' " ' " (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1081 [81 Cal.Rptr.2d 46].) Manatt also notes that, "[c]onsistent with the goal of 'avoiding the chilling of novel or debatable legal claims' [citation], reported cases holding legal claims to be frivolous have involved simple legal issues arising in uncomplicated factual contexts." It asserts that in this case, given the complexity of the issues and the lack of

disagreement, however, does not affect the soundness of the *TCPIP* court's reasoning regarding the requirement that a mark must be famous as the designator of the plaintiff's goods or services.

[17] Indeed, in the Fund's opposition to Franklin Mint's motion for summary judgment in the underlying lawsuit the Fund, represented by Manatt, recognized that trademark dilution claims required proof of secondary meaning: "Princess Diana's <u>persona</u> is a 'mark' for both [15 U.S.C.] § 1125(a) and (c) purposes, but evidence of secondary meaning with regard to that persona is needed to prevail on the § 1125(c) claims." (See also *Cairns I, supra*, 24 F.Supp.2d at p. 1035, fn. 18.)

directly controlling authority, we should find that it had a legally tenable basis for asserting a trademark dilution claim.

■ To be sure, the law of trademark is specialized and requires a rigorous analysis. It also is true that there was no previous case quite like the underlying case, where a person achieved worldwide fame unconnected to any goods or services she provided and her successor subsequently sought protection for her name and image under the trademark dilution law. But a lawyer is not immune from liability for malicious prosecution simply because the general area of law at issue is complex and there is no case law with the same facts that establishes that the underlying claim was untenable. Lawyers are charged with the responsibility of acquiring a reasonable understanding of the law governing the claim to be alleged. That achieving such an understanding may be more difficult in a specialized field is no defense to alleging an objectively untenable claim. Nor is it a defense to say that an attorney is arguing for an extension, modification, or reversal of existing law when that attorney is asserting legal theories that simply ignore fundamental principles on which that law is based.[18] That is especially true here, because the fundamental principles of trademark law—that a trademark must be used to identify a product or service and its source, and that a descriptive mark (such as a personal name) must acquire a secondary meaning such that the source-identifying meaning predominates over its descriptive meaning in the minds of the public—are clear and well established. Indeed, a proper understanding of those principles, and proper application of them to the facts of the underlying case, is neither difficult nor mysterious. Application of those fundamental principles establishes that no reasonable attorney would have thought the trademark dilution claim tenable.[19]

---

[18] We note that the district court in the underlying case distinguished between those theories Manatt advanced that, although unsuccessful, "could be considered an attempt to extend existing law," and those that could not because they were "groundless and unreasonable," when it denied Franklin Mint's request for attorney fees for the false endorsement claim but granted the request for the trademark dilution claim. (*Cairns IV, supra*, 115 F.Supp.2d at p. 1188.) We do not by this reference mean to imply that we rely on the truth of the district court's findings when we conclude that Manatt's assertion of the legal theories at issue here did not constitute an attempt to extend, modify, or reverse existing law.

[19] Manatt's argument that the federal district court's denial of Franklin Mint's motion to dismiss in the underlying case establishes probable cause as a matter of law is meritless. The underlying complaint alleged that "Princess Diana's name and image have been intensively and extensively advertised and promoted throughout the world in connection with her charitable activities, and as a result of this advertising and promotion, the name and image have come to mean and are recognized in worldwide trading areas and channels of trade as distinctive marks which identify the source of the charitable activities of Diana, Princess of Wales." On a motion to dismiss, the district court was required to accept all material allegations as true and construe them in the light most favorable to the nonmoving party. (*Cairns I, supra*, 24 F.Supp.2d at p. 1023, citing *Barron v. Reich* (9th Cir. 1994) 13 F.3d 1370, 1374.) Indeed, the court noted there is " 'a powerful presumption against rejecting pleadings

### D. *There Was No Probable Cause to Prosecute the False Advertising Claim*

 Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) provides two distinct bases of liability with respect to the wrongful use of another's name, symbol, or device in connection with goods or services: (1) false representations concerning the association, origin, or endorsement of those goods or services (15 U.S.C. § 1125(a)(1)(A)) (false endorsement); and (2) false advertising or promotion that misrepresents the nature, characteristics, qualities, or geographic origin of goods, services, or commercial activities (15 U.S.C. § 1125(a)(1)(B)) (false advertising).[20] (See *Waits v. Frito-Lay, Inc., supra,* 978 F.2d at p. 1108; *Kournikova v. General Media Communications Inc.* (C.D.Cal. 2003) 278 F.Supp.2d 1111, 1116–1117.) In the underlying case here, the Fund brought separate claims for false endorsement and false advertising. Only the false advertising claim is at issue in this malicious prosecution case.

 "The elements of a Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false

---

for failure to state a claim.' " (*Cairns I, supra,* 24 F.Supp.2d at p. 1023, quoting *Gilligan v. Jamco Development Corp.* (9th Cir. 1997) 108 F.3d 246, 249.) Thus, the court was required to accept as true that Princess Diana had used her name as a trademark and that it had acquired secondary meaning in determining whether the trademark dilution claim stated a claim for relief. Although the district court expressed skepticism that the Fund would be able to prove secondary meaning given that "Diana, Princess of Wales has such a clear primary meaning as a description of the person herself . . . ," it concluded that "whether Princess Diana's name has acquired secondary meaning indicative of the source of her charitable works is best resolved on a motion for summary judgment." (*Cairns I, supra,* 24 F.Supp.2d at p. 1036.) Because the Fund had *alleged* that Princess Diana had used her name as a trademark and that the mark had acquired secondary meaning, the district court's decision to defer its determination of the merits of the claim until summary judgment was correct. Denial of the motion to dismiss simply means that the complaint sufficiently alleged ownership of a trademark by *alleging,* in general terms, trademark use and secondary meaning; it says nothing about whether Manatt's legal theory—that using Princess Diana's name or likeness in connection with appearing at charitable events constituted trademark use—was tenable. In any event, the district court's subsequent determination that the trademark dilution and false advertising claims were groundless and unreasonable negates any inference of probable cause that might arise from the court's earlier denial of Franklin Mint's motion to dismiss. (*Slaney v. Ranger Ins. Co.* (2004) 115 Cal.App.4th 306, 321 [8 Cal.Rptr.3d 915].)

[20] In its discussion in the respondent's brief regarding the false advertising claim, Manatt quotes the wrong subdivision; rather than quoting the false advertising provision of 15 United States Code section 1125(a)(1)(B), it quotes the false endorsement provision of section 1125(a)(1)(A).

statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." (*Southland Sod Farms v. Stover Seed Co.* (9th Cir. 1997) 108 F.3d 1134, 1139, fns. omitted.)

■ A false advertising claim may be based on a statement that is "literally false, either on its face or by necessary implication," or a statement that is "literally true but likely to mislead or confuse consumers." (*Southland Sod Farms v. Stover Seed Co., supra*, 108 F.3d at p. 1139.) If the statement is literally false, consumer deception is presumed, and there is no need to demonstrate the impact of the advertisement on consumers. (See, e.g., *Time Warner Cable, Inc. v. DIRECTV, Inc.* (2d Cir. 2007) 497 F.3d 144, 153; *Johnson & Johnson Vision Care v. 1-800 Contacts* (11th Cir. 2002) 299 F.3d 1242, 1247; *Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.* (1st Cir. 2002) 284 F.3d 302, 315.) "Where a statement is not literally false and is only misleading in context, however, proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical." (*William H. Morris Co. v. Group W, Inc.* (9th Cir. 1995) 66 F.3d 255, 258.)

The false advertising claim in the underlying action alleged that Franklin Mint "carried out in California and in interstate commerce a large scale program of deceptive advertising" in which false and misleading representations were made that " '100% of the . . . price [of Defendant's dolls and plates] will be donated to Diana, Princess of Wales' charities' and that 'all proceeds to go to Diana, Princess of Wales' Charities.' " (Original ellipses & bracketed addition.) The claim alleged that "[Franklin Mint's] representations are false in that [Franklin Mint] ha[s] never donated a penny to the Fund."[21] On appeal, Franklin Mint argues there was no probable cause to bring or prosecute this claim because (1) the Fund did not have standing to bring a false advertising claim under the Lanham Act, and (2) there was no evidence that the advertisements at issue were false or that they actually misled consumers. Although we find that Franklin Mint is precluded from raising the standing issue for the first time on appeal, we agree there was no probable cause to bring or prosecute the claim that was alleged.

---

[21] We note that the false advertising claim in the underlying case included an allegation that, as a result of Franklin Mint's alleged misrepresentations that the proceeds from the sale of certain items would be donated to Princess Diana's charities, members of the public were induced to purchase the items in the mistaken belief that the items were endorsed by Princess Diana, her estate or the Fund. To the extent Manatt attempts to show probable cause for the false advertising claim by reference to the false endorsement allegation included in that claim, we will disregard those attempts. A party cannot avoid liability for malicious prosecution by repeating an arguably tenable allegation from one claim in a separate and distinct claim.

### 1. *Franklin Mint is precluded from raising the issue of the Fund's standing to assert the false advertising claim*

█ The Ninth Circuit has held that a plaintiff bringing a false advertising claim under the Lanham Act must establish that the injury suffered as a result of the alleged false advertising "was 'competitive,' i.e., harmful to the plaintiff's ability to compete with the defendant." (*Barrus v. Sylvania* (9th Cir. 1995) 55 F.3d 468, 470; see also *Waits v. Frito-Lay, Inc., supra*, 978 F.2d at p. 1109.) Franklin Mint contends there was no probable cause for the false advertising claim because the Fund did not have standing to bring the claim, since the Fund did not compete with Franklin Mint and therefore could not have suffered any competitive injury.

█ Franklin Mint did not make this contention in the trial court in this case.[22] "A party may not for the first time on appeal present a new theory that '. . . contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial. . . .' [Citations.] A new theory may be advanced for the first time on appeal only where it involves 'a legal question determinable from facts which are not only uncontroverted in the record but could not be altered by the presentation of additional evidence.' [Citations.]" (*Cramer v. Morrison* (1979) 88 Cal.App.3d 873, 887 [153 Cal.Rptr. 865].) Manatt argues that had Franklin Mint made this argument in the district court, "the Fund would have had an opportunity to present additional evidence concerning the manner in which it conducted business, and the impact Franklin Mint's sales had on the Fund's ability to compete." Although we question whether Franklin Mint would have been required to raise the standing issue in the underlying lawsuit in order to assert lack of standing as evidence of lack of probable cause in the instant case, we cannot find—and Franklin Mint has not directed us to—anyplace in the record on appeal in which such an assertion was made. Because it appears that the standing issue presents a legal question that " 'could . . . be altered by the presentation of additional evidence' " (*ibid.*), Franklin Mint is precluded from raising it for the first time on appeal.

### 2. *The claim as alleged and prosecuted was not tenable*

█ We now turn to the merits of the false advertising claim to determine whether there was probable cause to prosecute. In making this determination, we limit our examination to the claim as it was alleged and prosecuted in the district court. "The test in a malicious prosecution action is not whether

---

[22] We cannot determine whether Franklin Mint made this argument in the underlying case; we do not have the entire record of that case, the appellate record in this case does not show any such argument having been made, and the various opinions by the district court and Ninth Circuit do not address the Fund's standing to bring the false advertising claim.

defendant had reasonable grounds to seek some kind of relief in the original action; it is instead whether he had reasonable grounds for asserting the theory for relief contained in the complaint and tried to the factfinder. . . . [C]ounsel for an unsuccessful plaintiff cannot shield himself from a malicious prosecution action by arguing that even if the only theory advanced in the complaint and at trial was groundless and maliciously asserted, he nonetheless possessed some other undisclosed and unlitigated, but tenable, theory. He must stand or fall on the theory advanced and if that theory is one which he knows, or should know, is groundless and he nevertheless maliciously advances it, he must fall." (*Williams v. Coombs* (1986) 179 Cal.App.3d 626, 644 [224 Cal.Rptr. 865], citation omitted, disapproved on another ground in *Sheldon Appel, supra,* 47 Cal.3d at p. 883, fn. 9; see also *Leonardini v. Shell Oil Co., supra,* 216 Cal.App.3d at p. 571 ["Probable cause for the initiation of an action depends upon the legal tenability of the action which was actually brought."].)

Here, the theory alleged in the underlying complaint was that Franklin Mint made statements in advertisements that *all* proceeds from *all* Princess Diana merchandise would be donated to Princess Diana's charities, and those statements were false because Franklin Mint did not donate any money to the Fund. But the actual advertisements, which were attached to the complaint, clearly do not make the representation alleged, and no reasonable attorney could argue that the advertisements could be construed to even suggest that all proceeds from all Princess Diana merchandise would be donated to charity (let alone to the Fund). One of the advertisements, for a tribute plate, stated at the top:

"A LIMITED EDITION COMMEMORATIVE PORTRAIT PLATE
"IN LOVING TRIBUTE

"Celebrating the enduring spirit and compassion of the woman
"who will forever be 'England's Rose'

"All proceeds to go to
"Diana, Princess of Wales' Charities"

At the bottom, the advertisement stated: "100% OF YOUR PURCHASE PRICE WILL BE DONATED TO DIANA, PRINCESS OF WALES' FAVORITE CHARITIES." A subsequent advertisement for the tribute plate did not include the "all proceeds" or "100% of your purchase price" language, but instead included the following: "THE FRANKLIN MINT HAS PLEDGED A MINIMUM OF 1.5 MILLION DOLLARS WORLDWIDE TO CHARITY IN TRIBUTE TO THE BELOVED PRINCESS DIANA." An-

other advertisement, for a Princess Diana porcelain portrait doll, states that the doll is presented by the Franklin Mint, in association with Great Ormond Street Hospital Children's Charity. The advertisement also notes that Princess Diana was president of Great Ormond Street Hospital for Children, and that "[t]he doll wears the only exact replica of the dress The Franklin Mint purchased at Christie's auction where all proceeds were donated to Diana's favorite charities." The remaining advertisements include the statement that the Franklin Mint had pledged a minimum of $1.5 million worldwide to charity in tribute to Princess Diana.

Despite the actual language of these advertisements, Manatt, representing the Fund, continued to assert in opposition to Franklin Mint's motion for summary judgment that "at least one" of the advertisements stated that all proceeds from all Princess Diana merchandise would be donated to Princess Diana's charities. Manatt, however, modified slightly its theory of liability at the summary judgment stage; Manatt argued that the advertisements were false because Franklin Mint "retained many times more from their sales of Princess Diana merchandise than they have 'pledged' to charity," and it had not even pledged an amount equal to the proceeds it obtained from sales of "the particular product which used that [all proceeds] ad." Manatt also offered another theory in opposition to the summary judgment motion, arguing that a number of Franklin Mint customers believed that the advertisements' "references to having 'pledged a minimum of $4 million [*sic*] worldwide to charity in tribute to the beloved Princess Diana' meant that Franklin Mint was donating a portion of the proceeds from the particular products depicted in the ads, when in fact [Franklin Mint was] not doing so."[23] We examine those theories, and the facts Manatt contends support them, to determine whether "any reasonable attorney would have thought the [theories] tenable . . . ." (*Sheldon Appel, supra*, 47 Cal.3d at p. 886.)

Manatt's first theory was premised upon its assertion that the advertisements were "literally false"—because they allegedly stated that all proceeds from all products would be donated to charity—and therefore consumer deception is presumed. (See, e.g., *Time Warner Cable, Inc. v. DIRECTV, Inc., supra*, 497 F.3d at p. 153.) As we noted above, no reasonable attorney could have thought that any of the advertisements even suggested that all proceeds from all Princess Diana merchandise would be donated to charity. To the extent Manatt contends only that the "all proceeds" advertisement for the

---

[23] Manatt also argued that summary judgment could not be granted on the false advertising claim because the advertisements falsely imply an endorsement. In making this argument, Manatt merely referred to its argument with regard to the false endorsement claim.

tribute plate was literally false, that contention also is untenable. That advertisement—which stated that "100% OF YOUR PURCHASE PRICE WILL BE DONATED TO DIANA, PRINCESS OF WALES' FAVORITE CHARITIES"—could only be construed to mean that the entire purchase price paid as a result of that advertisement would be donated to Princess Diana's favorite charities. The undisputed evidence is that all proceeds generated by that advertisement were interpleaded in the district court to be distributed to charity after resolution of the underlying lawsuit. The fact that Franklin Mint did not donate proceeds from sales of the tribute plate that were generated by other advertisements that did not include the "all proceeds" language does not render the "all proceeds" advertisement false, and no reasonable attorney could argue that it did.[24]

Manatt's second theory—that the advertisements led customers to believe that Franklin Mint was donating to charity a portion of the proceeds from the particular products depicted—is premised upon an assertion that the advertisements, even if not literally false, were misleading in context. Thus, this theory requires proof that the advertisements "deceived a significant portion of the recipients." (*William H. Morris Co. v. Group W, Inc., supra*, 66 F.3d at p. 258.) The only evidence in the record on appeal that might support this theory is a single sentence in a single declaration by a Franklin Mint customer. Although most of that three-page declaration focused upon the customer's belief that Franklin Mint's Princess Diana merchandise was associated in some way with the Fund (information that was relevant to the false endorsement claim, which is not at issue in this lawsuit), the declaration also included a sentence that arguably could support Manatt's theory: the customer stated that she bought a Princess Diana doll "under the assumption that part of the price of the doll ($195.00) was going to the Fund." The other customer declarations in the record, however, do not include similar statements, and instead focus solely on the customers' belief that the Princess Diana merchandise was associated with the Fund. In light of the absence of any evidence that a "significant portion" of Franklin Mint's customers were deceived into thinking that part of the purchase price of every Princess Diana product would be donated to charity, we conclude that no reasonable attorney would have thought that theory was tenable. In short, we hold there was no probable cause to prosecute the false advertising claim.

---

[24] Manatt's attempt to show there was probable cause by pointing to evidence that *after the underlying lawsuit was concluded* Franklin Mint donated the interpleaded funds to charities that had no direct connection to Princess Diana is unavailing. The issue is whether there was probable cause based upon the evidence in existence at the time of the underlying lawsuit; evidence of events that took place after the lawsuit play no part in that determination.

## DISPOSITION

The judgment is reversed. Franklin Mint shall recover its costs on appeal.

Suzukawa, J., concurred.

**MOSK, J.,**[*] Dissenting.—I respectfully dissent.

One can sympathize with any party that is sued and prevails. The cost in money and reputation can be significant. (Here, the Mint[1] was fortunate to have recovered its attorney fees incurred in defending the claims and an additional sum from the party that sued it.) But that does not mean that the lawyers who represented the losing party should be fair game.

I hope there is not a diminishing appreciation by the judiciary for the increasing hazards and pitfalls faced by those in private legal practice. "With increasing frequency, disgruntled defendants have brought claims for malicious prosecution and abuse of process against attorneys for opposing parties." (Crystal, *Limitations on Zealous Representation in an Adversarial System* (1997) 32 Wake Forest L.Rev. 671, 687 (Crystal); see Wasserman, *Malicious Prosecution: The Disfavored Tort That Will Not Go Away* (Aug. 11, 1999) 4 Andrews Sec. Litig. & Reg. Rep. No. 23, p. 13 ["there may have been more malicious prosecution opinions published in the past several years by California courts than on almost any other subject involving attorney liability claims"].) An attorney who asserts claims on behalf of a client should not be exposed to a malicious prosecution claim just because those claims do not fall within the four corners of established case precedent or the specific words of a statute, even though the claims are supported by defensible analogical reasoning from existing authority and evidence that arguably permits an inference of the ultimate facts to be proved.

As I discuss, the trial court correctly determined that Manatt had tenable claims and thus probable cause. The burden was on the Mint to prove that

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] I refer to plaintiffs and appellants Franklin Mint Company, Roll International Corporation, Steward Resnick and Lynda Resnick collectively and in the singular as the Mint. I refer to defendants and respondents Manatt, Phelps & Phillips, LLP, and Mark S. Lee collectively as Manatt. Reference to the "federal" or "underlying" action is to the underlying lawsuit. (See *Cairns v. Franklin Mint Co.* (C.D.Cal. 1998) 24 F.Supp.2d 1013 (*Cairns I*); *The Diana Princess of Wales Memorial Fund v. Franklin Mint Co.* (9th Cir. Feb. 24, 2000, Nos. 98-56722, 99-55157) 1999 WL 1278044 (*Cairns II*); *Cairns v. Franklin Mint Co.* (C.D.Cal. 2000) 107 F.Supp.2d 1212 (*Cairns III*); and *Cairns v. Franklin Mint Co.* (C.D.Cal. 2000) 115 F.Supp.2d 1185 (*Cairns IV*).) When I refer to "Manatt's claims," I speak of Manatt in its representative capacity.

Manatt *lacked* probable cause to assert its clients' claims in the federal action. The Mint has not established that the trial court erred in concluding that the Mint failed to meet that burden. The burdens of production and persuasion should not be shifted to Manatt.

Moreover, the record is inadequate to support the Mint's position that Manatt was not entitled to a directed verdict on the issue of probable cause. As reflected in the Mint's request for judicial notice, properly denied by this court, Manatt submitted literally *volumes* of evidence in support of the claims during the course of the federal action. That evidence was not before the trial court, nor is it before this court. One cannot conclude that the evidence was legally untenable *when one does not know what that evidence was*. The Mint's failure to present that evidence to the trial court *compelled* the trial court to rule on Manatt's motion for nonsuit that, as a matter of law, the Mint did not establish that Manatt lacked probable cause in the underlying action. I would affirm the judgment.

### A. *Malicious Prosecution and the Element of Probable Cause*

It might be useful to review some of the fundamental principles regarding the tort of malicious prosecution and the related law governing the ethical and legal obligations of lawyers presenting their clients' civil claims to a court.[2] (See *Sheldon Appel, supra*, 47 Cal.3d at p. 872; see also *Hufstedler, Kaus & Ettinger v. Superior Court* (1996) 42 Cal.App.4th 55, 62–63 [49 Cal.Rptr.2d 551] (*Hufstedler*).)

### 1. *The Tort of Malicious Prosecution*

The tort of malicious prosecution serves two distinct purposes. First, the tort is one aspect of a body of law intended to deter frivolous or malicious lawsuits. (See generally Note, *Groundless Litigation and the Malicious Prosecution Debate: A Historical Analysis* (1979) 88 Yale L.J. 1218, 1221–1232, cited in *Sheldon Appel, supra*, 47 Cal.3d at p. 873.) Similar objectives are also served by court rules and statutes that authorize court-imposed sanctions against parties and their attorneys for asserting frivolous or

---

[2] My discussion concerns malicious prosecution claims asserted against lawyers arising from the prosecution of civil litigation on a client's behalf. I do not specifically discuss claims asserted directly against the client (see, e.g., *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 665 [43 Cal.Rptr.3d 148] (*Paulus*)), or claims asserted by a person maliciously subjected to unwarranted criminal charges. (See *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel*); 1 Harper et al. on Torts (3d ed. 2006) §§ 4.1–4.7, pp. 455–515; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 475, pp. 701–702.)

vexatious claims,[3] and by ethics rules that subject attorneys to professional discipline for advocating such claims on behalf of their clients.[4] (See *Brennan v. Tremco Inc.* (2001) 25 Cal.4th 310, 314–315, 105 Cal.Rptr.2d 790, 20 P.3d 1086; *Sheldon Appel, supra,* 47 Cal.3d at pp. 873–874; see generally Wade, *supra,* 14 Hofstra L.Rev. at pp. 433–436; 1 Mallen & Smith, Legal Malpractice (2010 ed.) § 6:17, p. 804 (Mallen & Smith) ["the most useful and meaningful tests [of probable cause in a malicious prosecution action] derive from an examination of an attorney's ethical and professional obligations to a client"].)[5]

Second, the tort action for malicious prosecution is "intended to protect an individual's interest 'in freedom from unjustifiable and unreasonable litigation' [citation] . . . ." (*Sheldon Appel, supra,* 47 Cal.3d at p. 878; see also *Siebel v. Mittlesteadt* (2007) 41 Cal.4th 735, 740 [62 Cal.Rptr.3d 155, 161 P.3d 527]; *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50–51 [118 Cal.Rptr. 184, 529 P.2d 608] (*Bertero*); *Hufstedler, supra,* 42 Cal.App.4th at p. 65.) "Frivolous lawsuits cause appreciable harm to many persons, and in many ways. The person against whom the groundless suit is brought is subjected to serious harassment and inconvenience, pecuniary loss through necessary attorney's fees, deprival of time from his business or profession, and, in some cases, harm to reputation and even physical damage to person or property." (Wade, *supra,* 14 Hofstra L.Rev. at p. 433.) The tort remedy permits the party so injured to obtain compensation from the litigants or attorneys who instigate frivolous claims with malice. (*Sheldon Appel, supra,* 47 Cal.3d at p. 871.)

Providing a tort remedy for malicious prosecution, however, has significant drawbacks. "[C]ourts have long recognized that the tort has the potential to impose an undue 'chilling effect' on the ordinary citizen's willingness to . . . bring a civil dispute to court . . . ." (*Sheldon Appel, supra,* 47 Cal.3d at p. 872; accord, *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 817 [123 Cal.Rptr.2d 19, 50 P.3d 733] (*Wilson*), superseded by statute on another point as stated in *Hutton v. Hafif* (2007) 150 Cal.App.4th 527, 545–550 [59 Cal.Rptr.3d 109]; *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007,

---

[3] See, e.g., Code of Civil Procedure, section 128.5, subdivision (a); Federal Rules of Civil Procedure, rule 11(b) (28 U.S.C.) (Rule 11); see generally Wade, *Frivolous Litigation: On Frivolous Litigation: A Study of Tort Liability and Procedural Sanctions* (1986) 14 Hofstra L.Rev. 433, 457–490 (Wade) (surveying statutes and court rules authorizing sanction awards).

[4] See, e.g., Rules of Professional Conduct, rule 3-200(B); American Bar Association Model Rules of Professional Conduct, rule 3.1 (Model Rules); Restatement Third of Law Governing Lawyers, section 110, subdivision 1, page 171.

[5] I do not mean to suggest that we are bound by either the rules governing sanctions or the ethics rules in deciding this case under the common law of malicious prosecution. Those authorities, however, serve similar objectives and employ similar legal standards and terminology. Accordingly, I find those authorities sufficiently analogous that the principles they express are useful in examining the issues before this court.

1018 [85 Cal.Rptr.3d 838] (*Nichols*); *Paulus, supra*, 139 Cal.App.4th at p. 674.) "[I]t is . . . important 'that an individual be free to protect personal rights by resort to the courts without the threat of a countersuit for damages in the event the suit is unsuccessful' [citation], and courts have generally been sensitive to the need to carefully limit tort liability in the context of malicious prosecution of a civil proceeding . . . ." (*Sheldon Appel, supra*, 47 Cal.3d at p. 872, fn. 5.)

Moreover, the adversary system is premised on the notion that an advocate may zealously protect his or her client's interests. "Lawyers in an adversarial system are free to inflict hard blows on their opponents as part of their responsibility to zealously guard the interests of their clients . . . ." (*Caro v. Smith* (1997) 59 Cal.App.4th 725, 739 [69 Cal.Rptr.2d 306].) As one authority has observed, "One of the most serious threats to zealous advocacy is the imposition of sanctions against lawyers who file pleadings or make arguments that are deemed to be 'frivolous.' " (Freedman & Smith, Understanding Lawyer's Ethics (2d ed. 2002) § 4.07, p. 93.) Attorneys fearful of a retaliatory lawsuit "might temper the zealousness of their advocacy to avoid increasing the incentive for the adversary to pursue" such a suit. (*Kracht v. Perrin, Gartland & Doyle* (1990) 219 Cal.App.3d 1019, 1028 [268 Cal.Rptr. 637] [discussing assignment of malpractice claims to former adversaries]; see Crystal, *supra*, 32 Wake Forest L.Rev. at pp. 687–688.) Moreover, "overuse of the charge of frivolousness would chill not only the *zeal* but the *creativity* of lawyers who operate on the leading edge of legal development. Even 'settled' legal questions must be open to challenge at some point, or else the law would stultify." (2 Hazard et al., The Law of Lawyering (3d ed. 2010) § 27.12, p. 27-26, italics added (Hazard & Hodes); see also 1 Mallen & Smith, *supra*, § 6:17, pp. 804–805.) "The law . . . is not immutable. It remains in flux to allow for constructive change through the efforts of diligent and conscientious lawyers. It is through legal imagination and ingenuity in pleading that evolution of the law occurs. Whether we examine the law of torts and the development of strict liability for product defect [citation] or family law and the division of retirement benefits as community property [citation], we note the effect of the dynamics of the legal process. Statutes which withstand constitutional challenge in one year may be declared unconstitutional in later years." (*Umansky v. Urquhart* (1978) 84 Cal.App.3d 368, 372 [148 Cal.Rptr. 547].)

Because of these potential chilling effects and the general "antipathy for litigation spawning litigation" (*Brennan v. Tremco Inc., supra*, 25 Cal.4th at p. 315), the tort of malicious prosecution "has traditionally been regarded as a disfavored cause of action." (*Sheldon Appel, supra*, 47 Cal.3d at p. 872; accord, *Zamos v. Stroud* (2004) 32 Cal.4th 958, 966 [12 Cal.Rptr.3d 54, 87 P.3d 802] (*Zamos*); *Wilson, supra*, 28 Cal.4th at p. 817; *Nichols, supra*, 168

Cal.App.4th at p. 1018; *Paulus, supra*, 139 Cal.App.4th at p. 674.) Accordingly, "the elements of the tort historically have been carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court by the prospect of a subsequent malicious prosecution claim." (*Sheldon Appel, supra*, 47 Cal.3d at p. 872.) One of the "carefully circumscribed" elements a malicious prosecution plaintiff must prove—and the only element at issue on this appeal is—that the defendant lacked probable cause to bring the underlying claim. (*Id.* at p. 871.)

## 2. *The Lack of Probable Cause Element*

Professor Wade stated that lack of probable cause is "[p]erhaps the most vital single requirement" of a malicious prosecution claim because, when combined with the element of malice, it "identif[ies] the real 'sting' of the tortious conduct." (Wade, *supra*, 14 Hofstra L.Rev. at p. 444.) Our Supreme Court has stated that it is the "strict requirements" of the probable-cause element that help ameliorate the negative aspects of the tort. " 'Concerns over the potential chilling effect [of malicious prosecution claims] are readily assuaged by *stringent enforcement* of the probable cause element of the malicious prosecution tort.' [Citation.] It is up to malicious prosecution plaintiffs to ensure that their lawsuits can survive the *rigorous judicial scrutiny* given to such actions." (*Siebel v. Mittlesteadt, supra*, 41 Cal.4th at p. 745, italics added, fn. omitted.) Accordingly, it is worthwhile to examine what "lack probable cause" means and what it does not mean.

In *Sheldon Appel, supra*, 47 Cal.3d at pages 885–886, our Supreme Court analogized the lack-of-probable-cause element in a malicious prosecution action to a frivolous appeal. (*Ibid.*, citing *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].) The court held that for purposes of malicious prosecution, a claim is asserted *with* probable cause if it is "legally tenable"—that is, if "*any* reasonable attorney would have thought the claim tenable." (*Sheldon Appel, supra*, 47 Cal.3d at p. 886, italics added.) A claimant *lacks* probable cause "only if '*any* reasonable attorney would agree that the [claim] is *totally and completely* without merit.' " (*Id.* at p. 885, italics added; accord, *Zamos, supra*, 32 Cal.4th at p. 970; *Wilson, supra*, 28 Cal.4th at p. 817; *Nichols, supra*, 168 Cal.App.4th at p. 1018; *Paulus, supra*, 139 Cal.App.4th at p. 674.)

Generally, a claim is legally tenable if the claim is (1) legally sufficient, and (2) substantiated by competent evidence. (*Wilson, supra*, 28 Cal.4th at p. 821; *Nichols, supra*, 168 Cal.App.4th at pp. 1019–1020.) But a claim need not be meritorious, or even likely to be so, to be legally tenable. " 'Probable cause may be present even where a suit lacks merit. Favorable termination of the suit often establishes lack of merit, yet the plaintiff in a malicious

prosecution action must *separately* show lack of probable cause. Reasonable lawyers can differ, some seeing as meritless suits which others believe have merit, and some seeing as totally and completely without merit suits which others see as only marginally meritless. Suits which *all* reasonable lawyers agree totally lack merit—that is, those which lack probable cause—are the least meritorious of all meritless suits. Only this subgroup of meritless suits present[s] no probable cause.' [Citation.]" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 743, fn. 13 [3 Cal.Rptr.3d 636, 74 P.3d 737] (*Jarrow Formulas*).) This is because "it is not 'true charges' but rather legally tenable claims for relief that the law seeks to protect. [Citations.]" (*Sheldon Appel, supra,* 47 Cal.3d at p. 885.) " 'Counsel and their clients have a right to present issues that are arguably correct, *even if it is extremely unlikely that they will win . . . .* ' [Citation.]" (*Ibid.,* italics added; accord, *Wilson, supra,* 28 Cal.4th at p. 817; *Hufstedler, supra,* 42 Cal.App.4th at p. 66.) "A litigant or attorney who possesses competent evidence to substantiate a legally cognizable claim for relief does not act tortiously by bringing the claim, even if also aware of evidence that will weigh against the claim. Plaintiffs and their attorneys are not required, on penalty of tort liability, to attempt to predict how a trier of fact will weigh the competing evidence, or to abandon their claim if they think it likely the evidence will ultimately weigh against them. They have the right to bring a claim they think unlikely to succeed, so long as it is arguably meritorious." (*Wilson, supra,* 28 Cal.4th at p. 822; accord, *Zamos, supra,* 32 Cal.4th at p. 970, fn. 9; *Paulus, supra,* 139 Cal.App.4th at pp. 674–675; *Marijanovic v. Gray, York & Duffy* (2006) 137 Cal.App.4th 1262, 1271 [40 Cal.Rptr.3d 867].)

Accordingly, a civil litigant is held to a "relatively low standard of probable cause . . . . [Citation.]" (*Wilson, supra,* 28 Cal.4th at p. 823, fn. 8, citing *Sheldon Appel, supra,* 47 Cal.3d at p. 885; see *Nichols, supra,* 168 Cal.App.4th at p. 1018 [" 'less stringent' standard"]; *Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, 1047 [79 Cal.Rptr.3d 822] (*Plumley*) ["low threshold" and "lenient standard"]; *Paulus, supra,* 139 Cal.App.4th at p. 674 ["lenient standard"].) "[P]robable cause to bring an action does not depend upon it being meritorious, as such, but upon it being *arguably tenable,* i.e., not so completely lacking in apparent merit that no reasonable attorney would have thought the claim tenable." (*Wilson, supra,* 28 Cal.4th at p. 824.)

Although this standard is easy to state, our Supreme Court has recognized that it may be difficult to apply in a particular case. (*Zamos, supra,* 32 Cal.4th at p. 970.) As one authority has observed, "judges display different levels of tolerance for ultimately losing arguments, or when they disagree among themselves as to where the 'leading edge' of present law is, and hence the starting place for good faith argument over extension or modification. The problem is compounded because different judges may be more or less likely to see possibilities in a case that counsel has not recognized or has not

articulated well." (Hazard & Hodes, *supra*, § 27.7, p. 27-13, fn. omitted.) Accordingly, our Supreme Court has cautioned that "[t]he question whether, on a given set of facts, there was probable cause to institute an action requires a sensitive evaluation of legal principles and precedents" to preserve "the distinction between a merely unsuccessful and a legally untenable claim." (*Sheldon Appel, supra*, 47 Cal.3d at p. 875; see also *Wilson, supra*, 28 Cal.4th at p. 817.) The "court must properly take into account the *evolutionary potential of legal principles*. [Citation.]" (*Sheldon Appel, supra*, 47 Cal.3d at p. 886, italics added; accord, *Nichols, supra*, 168 Cal.App.4th at p. 1019; *Paulus, supra*, 139 Cal.App.4th at p. 674.) As the court stated in *Nichols*, " 'Consideration of this question [of whether the underlying suit was legally tenable] requires that the court take account of the evolutionary potential of legal principles and any uncertainty which might be embedded there. [Citation.] "To hold that the person initiating civil proceedings is liable unless the claim proves to be valid, would throw an undesirable burden upon those who by advancing claims not heretofore recognized nevertheless aid in making the law consistent with changing conditions and changing opinions. There are many instances in which a line of authority has been modified or rejected. To subject those who challenge this authority to liability for wrongful use of civil proceedings might prove a deterrent to the overturning of archaic decisions." [Citations.]' [Citation.]" (*Nichols, supra*, 168 Cal.App.4th at p. 1019.)

These principles make clear that a claim is *not* untenable cause merely because there is no existing authority that indisputably establishes its legal viability. Indeed, a claim is not necessarily untenable *even if the existing authority is directly adverse*, provided there is a tenable basis to argue for an extension, modification, or reversal of existing law. (See, e.g., Rest.3d Law Governing Lawyers, § 110, subd. (1), p. 171; Model Rules, rule 3.1.)[6]

---

[6] "Legal conventions necessarily require that, at any point in time, well-trained lawyers be able to distinguish more plausible arguments from less plausible ones and, more to the point, plausible legal arguments from frivolous ones. However, it follows from the basic premises of legal historicism that what makes a good legal argument a good legal argument changes historically. The judgments of well-socialized lawyers about what is more plausible and less plausible, and even between what is 'on the wall' and what is totally 'off the wall,' are not fixed; rather, they evolve over time in response to historical and political forces in addition to the inevitable internal changes in legal doctrine. There is, therefore, no such thing as an inherently 'frivolous' legal argument considered transhistorically, although at any point in time there are plenty of 'frivolous' legal arguments, and well-trained lawyers are defined in part by their ability to spot and denounce them. Indeed one of the most remarkable features of any study of American legal history is watching arguments migrate from the category of 'frivolous' or 'unthinkable' to 'reasonable, albeit, all things considered, unpersuasive' to 'reasonable, and on the whole the better argument,' to being so overwhelmingly persuasive that to criticize them is to be tarred with the brush of 'frivolity' and, possibly, subjected to legal sanctions under Rule 11." (Balkin & Levinson, *Legal Historicism and Legal Academics: The Roles of Law Professors in the Wake of* Bush v. Gore (2001) 90 Geo. L.J. 173, 181.)

One notorious example from a different but related context illustrates the wisdom of this rule. In *Hunter v. Earthgrains Co. Bakery* (4th Cir. 2002) 281 F.3d 144 (*Hunter*), a federal district court in the Fourth Circuit entered summary judgment against the plaintiffs in an employment discrimination case on the ground, inter alia, that the plaintiffs were required to arbitrate their claims. (*Id.* at p. 148.) The district court then suspended the plaintiff's lawyer for five years as a sanction under Rule 11 because, "first and foremost," the lawyer had asserted a legal position on the arbitration issue that was directly contrary to existing Fourth Circuit precedent. (281 F.3d at p. 150.) The district court judge characterized the attorney's argument as " 'utter nonsense' " and " 'paradigmatic of a frivolous legal contention.' " (*Id.* at p. 153.)

The Fourth Circuit Court of Appeals reversed the sanction order. The appellate court agreed that the argument advanced by the lawyer was directly contrary to existing Fourth Circuit authority. (*Hunter, supra*, 281 F.3d at p. 154.) But, the appellate court noted, six *other* federal circuits had rejected the Fourth Circuit's reasoning, and none had agreed with it. (*Ibid.*) Moreover, by the time the district court issued its sanction order, the United States Supreme Court had, in a different case, adopted the legal position advocated by the plaintiffs' lawyer. (*Id.* at p. 155.) As a result, "[w]hen the district court suspended [the lawyer] for advancing a legal position that was 'not the law of this circuit,' . . . it was itself propounding a legal proposition in conflict with the Supreme Court's . . . decision." (*Id.* at pp. 155–156, citation omitted.) The appellate court thus concluded that the lawyer "was plainly entitled (and probably *obligated*) to maintain that [the Fourth Circuit precedent] was incorrectly decided." (*Id.* at p. 156, italics added, fn. omitted.) The court observed, "[I]f it were forbidden to argue a position contrary to precedent, 'the parties and counsel who in the early 1950s brought the case of *Brown v. Board of Ed.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), might have been thought by some district court to have engaged in sanctionable conduct for pursuing their claims in the face of the contrary precedent of *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). The civil rights movement might have died aborning.' [Citation.]" (*Hunter, supra*, 281 F.3d at p. 156, quoting *Blue v. United States Dept. of Army* (4th Cir. 1990) 914 F.2d 525, 534; see also Cochran, *Rule 11: The Road to Amendment* (1991) 61 Miss. L.J. 5, 9 & fns. 16, 19; Stein, *Rule 11 in the Real World: How the Dynamics of Litigation Defeat the Purpose of Imposing Attorney Fee Sanctions for the Assertion of Frivolous Legal Arguments* (1990) 132 F.R.D. 309, 318.)

Of course, I do not suggest that this case is comparable to *Brown v. Board of Education, supra*, 347 U.S. 483. But the policy of fostering the sort of zealous and creative advocacy that led to the *Brown* decision may be endangered if, in cases like this one, courts hold that attorneys lacked probable cause to assert claims on behalf of their clients. Examples such as

*Hunter, supra,* 281 F.3d 144 should caution judges adjudicating the legal tenability of a claim that, unless the claim is patently meritless, the benefit of the doubt should go to the lawyer. As the United States Supreme Court stated, "In searching for the strongest arguments available, the attorney *must be zealous and must resolve all doubts and ambiguous legal questions in favor of his or her client.*" (*McCoy v. Court of Appeals of Wisconsin* (1988) 486 U.S. 429, 444 [100 L.Ed.2d 440, 108 S.Ct. 1895], italics added [discussing criminal defense attorneys].)

### 3. *Determining Probable Cause*

"Whereas the malice element is directly concerned with the *subjective* mental state of the defendant in instituting the prior action, the probable cause element calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.]" (*Sheldon Appel, supra,* 47 Cal.3d at p. 878.) "[I]f the trial court concludes that, on the basis of the facts known to the defendant, the filing of the prior action was objectively reasonable, the court has necessarily determined that the malicious prosecution plaintiff was not subjected to an unjustified lawsuit." (*Id.* at p. 883.) Whether a reasonable lawyer would have thought the claim legally tenable—an objective inquiry—is a legal issue that is reviewed de novo. (See *Arcaro v. Silva & Silva Enterprises Corp.* (1999) 77 Cal.App.4th 152, 156 [91 Cal.Rptr.2d 433] (*Arcaro*).) Another component of probable cause—the state of a defendant's knowledge of the supporting facts at the time of the initiation of the underlying lawsuit and thereafter—is potentially a factual issue that is reviewed under the substantial evidence standard of review. (*Sheldon Appel, supra,* 47 Cal.3d at p. 884; see *Estate of Tucker v. Interscope Records* (9th Cir. 2008) 515 F.3d 1019, 1031.)

Applying the objective standard for determining whether a claim is tenable may be challenging in a particular case. Some ancillary principles, however, may guide the court's decision. I have already discussed one of these—the concept that the "court must properly take into account the evolutionary potential of legal principles. [Citation.]" (*Sheldon Appel, supra,* 47 Cal.3d at p. 886.) There are others.

First, the malicious prosecution *plaintiff* bears the burden of producing evidence and persuading the court that the attorney defendant lacked probable

cause. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292 [46 Cal.Rptr.3d 638, 139 P.3d 30] (*Soukup*); *Sheldon Appel, supra,* 47 Cal.3d at p. 874; *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164 [80 Cal.Rptr.2d 66] (*Sangster*).) The defendant is *not* required affirmatively to establish probable cause. Moreover, the plaintiff cannot establish lack of probable cause merely by establishing that the claim was determined to be unmeritorious in the underlying action. As discussed *ante,* "[f]avorable termination of the suit often establishes lack of merit, yet the plaintiff in a malicious prosecution action must *separately* show lack of probable cause." (*Jarrow Formulas, supra,* 31 Cal.4th at p. 743, fn. 13, original italics; 1 Mallen & Smith, *supra,* § 6:17, p. 808 ["The plaintiff must show *both* a lack of merit *and* a lack of probable cause." (Italics added.)].)[7] When considering probable cause, " ' "[*T*]*he inquiry* [*is*] *not whether the plaintiff had in fact a good and valid cause of action, but whether this was apparently true, and it was accordingly the right of the plaintiff to invoke a judicial decision concerning the merits of the case presented for determination* . . . ." ' [Citation.]" (*Wilson, supra,* 28 Cal.4th at p. 818, original italics; see also 1 Mallen & Smith, *supra,* § 6:17, p. 807 ["[T]he inquiry concerns the *apparent existence of reasonable grounds* for the attorney's decision to initiate or continue the proceedings." (Italics added.)].) For example, neither a defense summary judgment nor a denial of a motion for preliminary injunction in the underlying action establishes that a claim is untenable. (*Jarrow Formulas, supra,* 31 Cal.4th at p. 742 [defense summary judgment]; *Paulus, supra,* 139 Cal.App.4th at p. 667, fn. 6 [denial of preliminary injunction].)

Second, the malicious prosecution plaintiff may prove lack of probable cause in two ways that, although related, are distinct. (See *Morrison v. Rudolph* (2002) 103 Cal.App.4th 506, 512 [126 Cal.Rptr.2d 747] (*Morrison*), disapproved on another ground in *Zamos, supra,* 32 Cal.4th at p. 973; *Sangster, supra,* 68 Cal.App.4th at pp. 164–165; *Puryear v. Golden Bear Ins. Co.* (1998) 66 Cal.App.4th 1188, 1195 [78 Cal.Rptr.2d 507] (*Puryear*).) "In considering the issue of probable cause there is an analytical dichotomy which arises due to the factual/legal duality involved in virtually all lawsuits. In a typical case the merits of the lawsuit depend upon the factual circumstances established by the evidence and the legal theory upon which relief is sought. A litigant will lack probable cause for his action if he relies upon facts which he has no reasonable cause to believe to be true, or seeks recovery upon a legal theory which is untenable under the facts known to

---

[7] As Professor Wade observed, "[t]his requirement is unusual in that it places the burden on the present plaintiff to prove a negative . . . ." (Wade, *supra,* 14 Hofstra L.Rev. at p. 444.) But it is by placing such burdens on the malicious prosecution plaintiff—and by enjoining courts to enforce strictly such requirements—that the law seeks to mitigate the chilling effects of the tort. (See *Siebel v. Mittlesteadt, supra,* 41 Cal.4th at p. 745; *Leonardini v. Shell Oil Co.* (1989) 216 Cal.App.3d 547, 566 [264 Cal.Rptr. 883] (*Leonardini*).)

him. The probable cause analysis may differ depending upon where the alleged deficiency lies." (*Leonardini, supra,* 216 Cal.App.3d at p. 568.)

Thus, one method of showing lack of probable cause is to prove that no reasonable attorney would contend that the facts alleged in the underlying action would establish liability under the legal theory advanced—i.e., the claim is *legally* untenable. (See *Soukup, supra,* 39 Cal.4th at p. 292; *Slaney v. Ranger Ins. Co.* (2004) 115 Cal.App.4th 306, 319 [8 Cal.Rptr.3d 915] (*Slaney*).) " '[F]rom the legal perspective,' an action is tenable 'if it is supported by existing authority or the reasonable extension of that authority.' " (*Morrison, supra,* 103 Cal.App.4th at p. 512, quoting *Arcaro, supra,* 77 Cal.App.4th at p. 156.)

The other method is to prove that the attorney (1) alleged facts the attorney knew or subsequently learned were not true, or (2) the attorney had no reasonable basis to infer that evidence of the alleged facts could be developed through discovery or further investigation—i.e., the claim is *factually* untenable. (See *Soukup, supra,* 39 Cal.4th at p. 292; see also *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 222 [105 Cal.Rptr.3d 683]; *Slaney, supra,* 115 Cal.App.4th at p. 319; *Morrison, supra,* 103 Cal.App.4th at p. 512; *Swat-Fame, Inc. v. Goldstein* (2002) 101 Cal.App.4th 613, 625–627 [124 Cal.Rptr.2d 556] (*Swat-Fame*), disapproved on another ground in *Zamos, supra,* 32 Cal.4th at p. 973; *Arcaro, supra,* 77 Cal.App.4th at pp. 156–157.)

Related to this standard of factual tenability is the rule that a lawyer is not required to possess all of the evidence necessary to prove a claim prior to filing a complaint. A reasonable lawyer may rely on discovery and further investigation conducted after filing the lawsuit to supply the evidentiary foundation for the claim. (Hazard & Hodes, *supra,* § 27.6, p. 27-10.) All that is required is that the lawyer have a reasonable factual basis to believe that such evidence may be developed. (See *Swat-Fame, supra,* 101 Cal.App.4th at p. 625 [lawyer had probable cause to assert fraud claim when lawyer's information "reasonably suggest[ed] that . . . evidence might come to light during discovery"]; *Arcaro, supra,* 77 Cal.App.4th at p. 156 [probable cause "requires evidence sufficient to prevail in the action or at least information reasonably warranting an inference there is such evidence" (citing *Puryear, supra,* 66 Cal.App.4th at p. 1195)].) This is because the threat of a malicious prosecution action "must not bar the courthouse door to people who have some support for a complaint but need discovery to prove their case." (*Frantz v. U.S. Powerlifting Federation* (7th Cir. 1987) 836 F.2d 1063, 1068 [discussing sanctions under Rule 11]; see also Model Rules, rule 3.1, com. [2] ["The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery."].)

Third, in determining whether the malicious-prosecution plaintiff has met his or her burden of proving lack of probable cause, the court should view the allegations in the underlying action most favorably to the attorney defendant. (*Sangster, supra*, 68 Cal.App.4th at p. 165; *Leonardini, supra*, 216 Cal.App.3d at p. 571.) As the court in *Leonardini* explained, "Three sound but separate policies compel liberality in construction of the pleadings. First, . . . the policy which favors open access to the courts for the resolution of conflicts. This policy is inconsistent with a rigid construction of the prior pleadings to support a malicious prosecution action. Second, the law favors the early resolution of disputes, including voluntary dismissal of suits when the plaintiff becomes convinced he cannot prevail or otherwise chooses to forego the action. This policy would be ill-served by a rule which would virtually compel the plaintiff to continue his litigation in order to place himself in the best posture for defense of a malicious prosecution action. [Citation.] Finally, and in any event, in this state pleadings are required to be liberally construed in favor of the pleader. [Citations.] The factual allegations of the complaint are controlling over the title or label given the pleading and over the prayer or demand for relief. [Citation.] In these respects federal rules of pleading are similar. [Citation.] Together these policies compel the conclusion that [the defendant's] complaint must be construed liberally in determining whether the action was legally tenable." (*Leonardini, supra*, 216 Cal.App.3d at p. 571.)

Fourth, "[c]laims that have succeeded at a hearing on the merits, even if that result is subsequently reversed by the trial or appellate court, are not so lacking in potential merit that a reasonable attorney or litigant would necessarily have recognized their frivolousness." (*Wilson, supra*, 28 Cal.4th at p. 818.) As relevant here, an order overruling a demurrer—or, in federal practice, denying a motion to dismiss—establishes as a matter of law the *legal* tenability of a cause of action as alleged. (*Swat-Fame, supra*, 101 Cal.App.4th at p. 625.) Because such an order does not address the evidence, however, it does not establish the *factual* tenability of the claim.

### B. *The Mint Failed to Establish Lack of Probable Cause*

The principles discussed in the preceding part compel the conclusion that the trial court was correct in determining that the Mint failed as a matter of law to establish that Manatt lacked probable cause to assert the trademark dilution and false advertising claims at issue here. The *legal* tenability of both claims, as alleged, was established by the order of United States District Judge Richard Paez denying the Mint's motion to dismiss. Moreover, properly taking into account the evolutionary principles of the law, Manatt had an arguable legal basis for asserting both claims. As to *factual* tenability, the Mint produced *no evidence whatever* to establish that the factual allegations

in the underlying complaint were false; Manatt knew them to be false; after filing the complaint, Manatt learned specific, verifiable facts that precluded the claims; or Manatt had no reasonable basis to believe that competent evidence to support the claims could be developed through discovery or additional investigation.

### 1. *Trademark Dilution*

#### a. *Legal Tenability*

In *Swat-Fame, supra*, 101 Cal.App.4th at page 626, the Court of Appeal held, inter alia, "Because the allegations in the complaint were true to the best of the [lawyer-defendants'] knowledge at the time the complaint was filed, and because the trial court overruled Swat-Fame's demurrer . . . , the lawyers necessarily had probable cause to bring the claim . . . ." This is a sound rule, for it is consistent with the principle that "[c]laims that have succeeded at a hearing on the merits . . . are not so lacking in potential merit that a reasonable attorney or litigant would necessarily have recognized their frivolousness" (*Wilson, supra*, 28 Cal.4th at p. 818); it mitigates " 'the potential [of malicious prosecution claims] to penalize and deter the legitimate invocation of the judicial process for redress of grievances' " (*Plumley, supra*, 164 Cal.App.4th at p. 1052, quoting *Wilson, supra*, 28 Cal.4th at p. 818); and it " 'vindicat[es] . . . the dignity and authority of judicial tribunals . . . in order that their judgments and decrees may be invested with that force and sanctity which shall be a shield and protection to all parties and persons in privity with them' " (*Plumley, supra*, 164 Cal.App.4th at p. 1052, fn. 8, quoting *Crescent Live Stock Co. v. Butchers' Union* (1887) 120 U.S. 141, 159 [30 L.Ed. 614, 7 S.Ct. 472]). That rule disposes of the legal tenability issue here.

In the underlying case, the Mint moved to dismiss the trademark dilution claim. (*Cairns I, supra*, 24 F.Supp.2d at pp. 1033–1036.) After an examination of the allegations stated in the complaint and the relevant legal authorities, Judge Paez concluded that—although the claim might be difficult to prove—the complaint stated a claim for trademark dilution. (*Ibid.*) Under the rule of *Swat-Fame, supra*, 101 Cal.App.4th at page 626, the district court's ruling established as a matter of law the *legal* tenability of the trademark dilution claim.

Plaintiff argues that Judge Paez's ruling was not conclusive as to probable cause because, in ruling on a motion to dismiss, he was required to accept all

material allegations as true and construe them in a light most favorable to the nonmoving party. But that observation concerns only *factual* tenability. Plaintiff does not seek to distinguish *Swat-Fame, supra,* 101 Cal.App.4th 613, or argue that it was wrongly decided. Accordingly, legal tenability of the trademark dilution claim was established as a matter of law by Judge Paez's denial of the Mint's motion to dismiss.

United States District Judge Florence-Marie Cooper, who characterized the dilution claim as "absurd" in her order granting the summary judgment in favor of the Mint in the federal action, stated in awarding the Mint its attorney fees that the dilution claim was "just *short* of frivolous." (*Cairns IV, supra,* 115 F.Supp.2d at p. 1189, italics added.) *Short* of frivolous is not frivolous; not frivolous is legally tenable. (See *Sheldon Appel, supra,* 47 Cal.3d at p. 885 [defining probable cause by reference to standard for frivolous appeals].) To the extent Judge Cooper's decision on the attorney fee motion is relevant,[8] it supports rather than contradicts the conclusion that the claim had a tenable legal basis.

Even if Judge Paez's ruling did not establish the legal tenability of the claim, the authorities cited by Manatt are sufficient to permit a reasonable lawyer to *argue* its legal merit, particularly taking into account the evolutionary potential of the law. Lack of probable cause is not established by Judge Paez's order denying Manatt's motion for a preliminary injunction, nor by Judge Cooper's order granting the defense summary judgment. (*Jarrow Formulas, supra,* 31 Cal.4th at p. 742; *Paulus, supra,* 139 Cal.App.4th at p. 667, fn. 6.) The issue is not whether Manatt's legal position was *meritorious,* but whether the contrary position was "so absolutely correct that *no reasonable attorney* would have thought otherwise." (*Hufstedler, supra,* 42 Cal.App.4th at p. 67, italics added.)

The Mint has cited no authority *directly* adverse to Manatt's dilution claim, and to my knowledge there is none because of the unique circumstances presented by who Princess Diana was and the fame she achieved. The trademark authorities cited by Manatt establish *principles* from which a reasonable lawyer, zealously and creatively representing his client's interests, could argue that a legal framework had been established that would permit

---

[8] Judge Cooper's award of attorney fees was expressly based, as she said, "on [Manatt's] 'absurd' contention that 'Diana, Princess of Wales' had taken on a meaning other than identification of an individual. (June 27, 2000 Order at 21.) Attempting to argue that 'Diana, Princess of Wales' had acquired a secondary meaning falls just short of frivolous." (*Cairns IV, supra,* 115 F.Supp.2d at p. 1189.) Manatt's allegation that " 'Diana, Princess of Wales' had taken on a meaning other than identification of an individual," however, was a *factual* allegation *subject to proof,* not a *legal* claim. Judge Cooper's decision on the attorney fee motion in *Cairns IV* thus might relate to the *factual tenability* of the claim, but it does not affect Judge Paez's original conclusion that, as pleaded, the dilution claim was *legally* tenable.

Manatt's clients to recover under a trademark dilution theory. That is how the law evolves—good lawyers, usually in weak cases, reasoning from established principles to advocate an extension, modification, or reversal of existing law. Even cases that "are factually dissimilar . . . may be relied on as furnishing some basis for finding [a] claim to have been objectively tenable." (*Paulus, supra,* 139 Cal.App.4th at p. 682, fn. 19.)

Indeed, in *Peaceable Planet, Inc. v. Ty, Inc.* (7th Cir. 2004) 362 F.3d 986, 990, United States Court of Appeals Judge Richard Posner observed that the rule that a personal name cannot obtain trademark protection without secondary meaning is a common law "generalization" rather than a statutory absolute, and stated that when the "rule" "would impede rather than promote competition and consumer welfare, an exception should be recognized." Such views hardly signify an immutable legal precept when it comes to determining whether there is trademark protection. It is precisely the fluidity of legal principles that licenses creativity by attorneys in formulating their clients' claims and the legal arguments that support them. Based on the foregoing, the only question remaining is whether the Mint proved by a preponderance of the evidence that the claim was *factually* untenable.

### b. *Factual Tenability*

To establish that the dilution claim was factually untenable, the Mint bore the burden of proving by a preponderance of the evidence that (1) Manatt knew when it filed the complaint, or it subsequently learned, that the facts alleged in the complaint were not true, or (2) when the complaint was filed, Manatt had no reasonable basis to infer that evidence of such facts could be developed through discovery or further investigation. (See *Soukup, supra,* 39 Cal.4th at p. 292; see also *Daniels v. Robbins, supra,* 182 Cal.App.4th at p. 222; *Slaney, supra,* 115 Cal.App.4th at p. 319; *Morrison, supra,* 103 Cal.App.4th at p. 512; *Swat-Fame, supra,* 101 Cal.App.4th at pp. 625–627; *Arcaro, supra,* 77 Cal.App.4th at pp. 156–157.) Implicit in the first standard, of course, is the requirement that the Mint prove that the factual allegations were, in fact, false. The Mint failed to meet its burden under either standard.

The Mint failed as a matter of law to prove factual untenability for the simple reason that the Mint did not introduce into evidence in this case the factual record developed in the underlying case. (See *Hufstedler,* 42 Cal.App.4th at pp. 65–66 [noting that, in some circumstances when there are no disputed facts, "the record in the underlying action" may "constitute[] all

the evidence needed to determine whether the underlying action was objectively tenable"].) There is no dispute that Manatt submitted evidence to the district court in support of the dilution claim both on its motion for a preliminary injunction (*Cairns I, supra*, 24 F.Supp.2d at p. 1038, 1043–1045) and in opposition to the Mint's motion for summary judgment. (*Cairns III, supra*, 107 F.Supp.2d at pp. 1221–1222.) The Mint's request for judicial notice, properly denied by this court because the material was not before the trial court, contains *nine volumes* of material exceeding *2,500* pages, a substantial portion of which is comprised of evidence submitted by Manatt in the underlying case. As the plaintiff in this malicious prosecution action, the Mint had the burden to produce the evidence necessary to prove factual untenability by a preponderance of the evidence. (*Soukup, supra*, 39 Cal.4th at p. 292; *Sheldon Appel, supra*, 47 Cal.3d at p. 874; *Sangster, supra*, 68 Cal.App.4th at p. 164.) Now, as the appellant, it is the Mint's burden to provide a record sufficient to permit this court to conclude, as a matter of law, that the trial court erred by finding (after 17 days of trial) that it was "overwhelmingly clear" that Manatt had a tenable basis to assert the claim. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574–575 [224 Cal.Rptr. 664, 715 P.2d 624].) The trial court rightfully concluded that the Mint could not prevail on its contention that there was no tenable evidence to support the claims pleaded by Manatt *when the evidence actually submitted by Manatt in support of those claims in the underlying action was not before the trial court*. To conclude otherwise would have been extraordinary.

Even if the Mint's failure to introduce the factual record in the underlying action does not compel judgment against it as a matter of law, the Mint nevertheless has failed to show that it is entitled to a reversal. In briefing this issue on appeal, the Mint has cited *no cognizable evidence* to establish that the trademark dilution claim was factually untenable.[9]

The rulings in the underlying case cannot be considered substantive evidence of lack of probable cause. *Mattel, Inc. v. Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179, 1191 [121 Cal.Rptr.2d 794] (*Mattel*) and *Slaney, supra*, 115 Cal.App.4th 306, to the extent they suggest otherwise, are

---

[9] In its opening brief, the Mint cited a few pages from its request for judicial notice, but this court has refused to judicially notice that material. In its written and oral arguments in the trial court in opposition to Manatt's motions for nonsuit and a directed verdict, the Mint also relied on testimony from (1) Mark Lee that Princess Diana was (as characterized by the Mint's trial attorney) "known for her royalty, her beauty, her style, her social life, her status as the mother of the future kings of England, and perhaps scandal"; and (2) the notes of a solicitor at a British law firm, attributing to Mr. Lee the statement that the trademark dilution claim was alleged solely "so that the wealth of evidence on charities could be introduced." The Mint's failure to argue such evidence in its briefs as grounds for reversing the judgment forfeited the Mint's right to rely such evidence. (See *Paulus, supra*, 139 Cal.App.4th at p. 685.) In any event, such evidence appears immaterial to a determination of objective probable cause.

demonstrably incorrect and inconsistent with other authorities. Both cases are nevertheless distinguishable from the instant case.

In *Mattel, supra,* 99 Cal.App.4th 1179, the malicious prosecution plaintiff settled a federal trademark infringement action brought by the defendant and later filed a malicious prosecution action against the defendant in California state court. The defendant moved under the so-called anti-SLAPP statute (Code Civ. Proc., § 425.16) (" 'strategic lawsuits against public participation' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85 [124 Cal.Rptr.2d 530, 52 P.3d 703])) to strike the malicious prosecution action. The trial court denied the motion, finding that the plaintiff had demonstrated a probability of prevailing on the merits. The appellate court affirmed. (*Mattel, supra,* 99 Cal.App.4th at pp. 1182–1183.) As relevant here, the primary issue on appeal was whether the settlement of the federal trademark action constituted a termination of that action favorable to the malicious prosecution plaintiff. The appellate court concluded that it did because the plaintiff had obtained sanctions against the defendant under Rule 11 for filing a meritless claim, reflecting a determination on the merits in favor of the malicious prosecution plaintiff. (*Mattel,* at pp. 1190–1191.) With respect to the probable cause and malice elements, however, the court in *Mattel* stated only the following, with no additional authority or analysis: "The findings made in connection with the [R]ule 11 . . . sanctions, the appropriate subject of judicial notice requested of the trial court (Evid. Code, § 451, subd. (a)), are evidence that the underlying action was filed without probable cause. Malice may be inferred from the lack of probable cause. [Citation.]"[10] (*Mattel, supra,* 99 Cal.App.4th at p. 1191, citation omitted.) The Court of Appeal in *Slaney, supra,* 115 Cal.App.4th at page 321, relied on *Mattel* without independent analysis. In those cases, the courts relied upon Rule 11 sanctions, which were not involved here. In both cases, however, the use of findings in the underlying case as *substantive evidence* of factual untenability, without discussion, was an improper use of judicial notice.

When a court takes judicial notice of a court ruling in another action, it may notice the *existence* of the ruling, but it may not take judicial notice of the *truth* of a factual finding made by a judge sitting as a trier of fact. (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 484 [104

---

[10] I note that the latter point—that malice is inferable solely from the lack of probable cause—probably was an incorrect statement of the law when *Mattel, supra,* 99 Cal.App.4th 1179, was decided. (See *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 498 [78 Cal.Rptr.2d 142], citing *Sheldon Appel, supra,* 47 Cal.3d at pp. 885–886.) In any event, shortly thereafter, our Supreme Court expressly rejected the notion that subjective malice can be inferred solely from an objective lack of probable cause. (*Jarrow Formulas, supra,* 31 Cal.4th at p. 743.)

Cal.Rptr.3d 545]; *Plumley, supra,* 164 Cal.App.4th at pp. 1050–1051; *Fowler v. Howell* (1996) 42 Cal.App.4th 1746, 1749 [50 Cal.Rptr.2d 484] ["a court may not take judicial notice of the truth of a factual finding made in another action" (italics omitted)]; *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1563–1569 & fn. 8 [8 Cal.Rptr.2d 552] (*Sosinsky*).)

The reasons for this rule recently were restated by this division in *Plumley, supra,* 164 Cal.App.4th 1031: " 'While we have no quarrel with the fact that a judge, after hearing a factual dispute between litigants A and B, may choose to believe A, and make a finding of fact in A's favor, and while we have no quarrel that at some subsequent time it may be proper to take judicial notice *that the judge did in fact make that particular finding* in favor of A, the taking of judicial notice that the judge *made* a particular factual finding is a far cry from the taking of judicial notice that the "facts" found by the judge must necessarily be the true facts, i.e., must necessarily be "the truth." To state this a bit more simply, the taking of judicial notice that the judge believed A (i.e., that the judge ruled in favor of A on a particular factual dispute) is different from the taking of judicial notice that A's testimony must necessarily have been true simply because the judge believed A and not B.' [Citation.]" (*Id.* at p. 1050, quoting *Sosinsky, supra,* 6 Cal.App.4th at p. 1565.) " '[N]either a finding of fact made after a contested adversary hearing nor a finding of fact made after any other type of hearing can be indisputably deemed to have been a correct finding. As we have noted, "[u]nder the doctrine of judicial notice, certain matters are assumed to be indisputably true, and the introduction of evidence to prove them will not be required." [Citation.] Taking judicial notice of the truth of a judge's factual finding would appear to us to be tantamount to taking judicial notice that the judge's factual finding must necessarily have been correct and that the judge is therefore infallible. We resist the temptation to do so.' [Citation.]" (*Plumley, supra,* 164 Cal.App.4th at p. 1050, fn. 7.) " 'It is the consequence of judicial notice that the "fact" noticed is, in effect, *treated as true for purposes of proof.* . . . Therefore, *a finding of fact that was judicially noticed would be removed as a subject of dispute and would be accepted for evidentiary purposes as true.* The effect would be that without resort to concepts of collateral estoppel or res judicata that would litigate whether the issue was fully addressed and resolved, a finding of fact would be removed from dispute in the other action in which it was judicially noticed.' [Citation.]" (*Plumley, supra,* 164 Cal.App.4th at p. 1051, italics added, original italics omitted.)

Although not directly on point, also instructive is *Soukup, supra,* 39 Cal.4th 260. In that case, the malicious prosecution defendant attempted to establish probable cause for the underlying claims by reference to "rulings in other cases," involving parties other than the malicious prosecution plaintiff, that

were favorable to the defendant. The other rulings included a judgment in the defendant's favor in a factually related malicious prosecution action brought by another person. (*Id.* at pp. 294–295.) The Supreme Court rejected the defendant's argument, stating, "But defendants do not contend, much less demonstrate, that these rulings have collateral estoppel effect on the issue of whether probable cause existed to support the [claims] in the underlying suit . . . . *Absent such effect, they are irrelevant to that issue.*" (*Id.* at p. 295, italics added.)

In this case, we should not repeat the errors in *Mattel, supra,* 99 Cal.App.4th 1179 and *Slaney, supra,* 115 Cal.App.4th 306 by taking judicial notice of the truth of the findings in the underlying case that Manatt's claims were "groundless and unreasonable." (*Cairns IV, supra,* 115 F.Supp.2d at p. 1188.) We can judicially notice only that the district court in the underlying case *made* such findings—but that fact has no bearing on *whether Manatt knew the claims to be false or had no reasonable basis to believe it could develop evidence to support the claims.* This court properly has rejected the Mint's argument that the district court's findings have a collateral estoppel effect as to the probable cause determination in this case. "Absent such effect, [those findings] are irrelevant to [the probable cause] issue." (*Soukup,* 39 Cal.4th at p. 295.) As a result, the Mint has produced *no cognizable evidence whatever to sustain its burden of proving lack of probable cause.* That should be the end of this case.

The Mint asserts that Manatt introduced no evidence at trial to show that Princess Diana used her name and likeness *as a trademark.* But this improperly shifts the burden of production from the plaintiff—the Mint—to the defendant—Manatt. In fact, as discussed, the Mint has cited no cognizable evidence in the record to establish that Diana did *not* use her name and likeness as a trademark, or that Manatt was aware of "specific information as to verifiable facts that, if true, would totally negate its cause of action." (*Swat-Fame, supra,* 101 Cal.App.4th at p. 627.) This improper burden shifting is a pervasive flaw in the Mint's argument.

That the trial court judge who denied Manatt's motion for summary judgment in this case suggested that Manatt's summary judgment evidence failed to refer to services provided by Princess Diana is irrelevant. That motion for summary judgment was denied and is not on review—we are reviewing the decision of a different trial judge made *after trial* based on the *trial record.*[11] The evidence submitted by Manatt in support of its summary judgment motion has no relevance here, particularly when that evidence is

---

[11] This is different than relying on a prior court decision to establish probable cause.

not part of the record on appeal. Of even less relevance—i.e., less than none, if that is possible—is the trial judge's *characterization* of that evidence in connection with the summary judgment motion. Furthermore, there is no basis in the record to restate the trial judge's comment that the evidence did "not mention any services"—a negative—as an *affirmative* statement that Princess Diana's name was used only as part of a textual reference to Princess Diana as an individual.

We cannot distinguish other celebrity cases from this case based on our own assumptions and views about Princess Diana. It is, of course, undisputed that Princess Diana was quite famous. Without evidence, neither the trial court nor this court can make categorical conclusions about people's perceptions at a particular point in time with respect to the words "Diana, Princess of Wales." Whether the "public" associates the phrase "Diana, Princess of Wales" with the Diana of the fairytale wedding and tabloid divorce, on the one hand, or the Diana who did charitable work, on the other, is a matter *subject to proof*, as is the questionable assumption that the words "Diana, Princess of Wales" could never gain secondary meaning. Such statements and assumptions are not undisputed facts supported by competent evidence in the record. They provide no basis for reversing the trial court's judgment in this case. Parenthetically, even if "Diana, Princess of Wales" did not have a secondary meaning during Princess Diana's life, it is conceivable that at some point after her death, Princess Diana's name might well become associated with her charities and thus achieve a secondary meaning. That this association might have occurred is an issue that Manatt tenably could argue.

### 2. *False Advertising*

The false advertising claim was not legally untenable. First, Judge Paez denied the Mint's motion to dismiss. In so doing, Judge Paez considered both the allegations in the body of the complaint *and the advertisements themselves*, which were attached to the complaint. Under federal pleading practice, "[a]ll documents attached to the pleadings as exhibits are considered part of the pleadings for the purposes of" a motion to dismiss. (*Cagan v. Intervest Midwest Real Estate Corp.* (N.D.Ill. 1991) 774 F.Supp. 1089, 1091, fn. 2; see Fed. Rules Civ.Proc., rule 10(c) (28 U.S.C.); Schwarzer et al., Cal. Practice Guide: Federal Civil Procedure Before Trial (The Rutter Group 2010) ¶ 8:680, p. 8-75 (rev. # 1, 2009).) In ruling on the Mint's motion to dismiss in the federal action, Judge Paez observed that the court could consider "exhibits submitted with the complaint . . . ." (*Cairns I, supra,* 24 F.Supp.2d at p. 1023.) Accordingly, the *legal* tenability of the false advertising was established as a matter of law.

Second, as discussed, in determining whether the malicious prosecution plaintiff has met its burden of proving lack of probable cause, the court must view the allegations in the underlying action most favorably to the attorney defendant. (*Sangster, supra*, 68 Cal.App.4th at p. 165; *Leonardini, supra*, 216 Cal.App.3d at p. 571.) This is not a case in which there was an attempt in the body of a complaint to misstate the facts or mislead the court. As stated, the advertisements were appended to the complaint and considered on the motion to dismiss. Accordingly, in determining whether Manatt had probable cause, we should reconcile the allegations stated in the body of the complaint with the advertisements appended to it, and construe the allegations most favorably to Manatt.

So construed, the false advertising claim was tenable. One of the advertisements offered for sale a limited edition commemorative plate and stated, "All proceeds go to Diana, Princess of Wales' Charities." It did *not* state, as mischaracterized by the Mint, that the Mint "would donate all of the proceeds of a particular portrait plate *ordered through a particular ad*." (Italics added.) It is undisputed that, when the action was filed, none of the proceeds from the sale of that plate had been donated to any charity, let alone "Diana, Princess of Wales' Charities." Manatt thus had probable cause to bring a false advertising claim based on that advertisement.

The deposit with the court by the Mint of a *portion* of the revenue generated by sales of the plate (as distinct from revenue from sales generated by the *ad*) did not divest Manatt of probable cause. It is also undisputed that, in fact, a significant portion of the proceeds from the sales of the plates were *never* donated to "Diana, Princess of Wales' Charities," but instead were donated to charities favored by the Mint's owners. The representation in the ad can be viewed as having been proved to be actually false. Even if such subsequent events cannot establish probable cause at the time the lawsuit was filed (see *Soukup, supra*, 39 Cal.4th at p. 295 [evidence obtained after filing action did not provide probable cause for filing, but that evidence was inadmissible in any event]), we should not permit a tortfeasor to maintain a malicious prosecution action simply because the tort was not finally completed until after the underlying action was terminated. These circumstances suggest that there was evidence that Manatt could develop to support its false advertising claim. This is another basis for supporting the trial court's determination that the Mint could not prevail on its malicious prosecution suit based on the false advertising claim.

Manatt's failure to establish that all of the Mint's advertisements appended to the complaint were false or misleading does not mean that Manatt lacked probable cause as to the claim or theory or ground of recovery. (See *Kreeger v. Wanland* (2006) 141 Cal.App.4th 826, 834 [46 Cal.Rptr.3d 790].) It cannot be

that an attorney is liable for malicious prosecution if probable cause was lacking for an alleged fact within the claim even if there was probable cause for the claim or theory of recovery.

## C. *Malicious Prosecution As to an Alternative Ground*

I have given my reasons why I believe the trial court's decision should be affirmed. I append a few additional comments on the subject of malicious prosecution.

By virtue of the Supreme Court's decision in *Crowley v. Katleman* (1994) 8 Cal.4th 666 [34 Cal.Rptr.2d 386, 881 P.2d 1083] (*Crowley*), we are justified in examining each of the causes of action in the underlying complaint prepared by Manatt in this case to determine if Manatt can be held liable for malicious prosecution. In *Crowley*, the court reaffirmed the rule of *Bertero, supra*, 13 Cal.3d 43, which held "that a suit for malicious prosecution lies for bringing an action charging multiple grounds of liability when some but not all of those grounds were asserted with malice and without probable cause." (*Crowley, supra*, 8 Cal.4th at p. 671.)

Both the majority and the dissent in *Crowley, supra*, 8 Cal.4th 666 made valid points on whether the rule of *Bertero, supra*, 13 Cal.3d 43, should be continued.[12] I note that in 2007 the Supreme Court of New Mexico addressed this issue as follows: "Viewing the certified questions with an eye toward protecting honest litigants, we believe that a court's analysis of probable cause should be undertaken in a manner that will likely have the least chilling effect on a litigant's access to the courts. Accordingly, we conclude that probable cause relates to the complaint as a whole, and the original plaintiff need not show favorable termination of each individual claim to establish an effective defense to a subsequent suit for malicious abuse of process. It would be too inhibiting of the right to seek redress in court if plaintiffs had to win on every count or be subject to a malicious abuse of process claim for any count that was unsuccessful. *See, e.g., Teefey v. Cleaves* 73 S.W.3d 813, 817 (Mo.Ct.App.2002) ("Separate counts in an underlying petition do not support separate actions for malicious prosecution: To allow a party to separate the unsuccessful claims from the successful claims in the underlying proceeding and bring a malicious prosecution action on the unsuccessful ones would invite a multitude of unwarranted litigation . . . ." (quoted authority omitted)). [¶] By allowing 'some form of recovery' for the plaintiff in the underlying suit, even though not on all counts, to serve as conclusive evidence of

---

[12] A court has gone even further than did the court in *Crowley, supra*, 8 Cal.4th 666, holding that "a malicious prosecution action [can] be maintained where most but not all of the amount sought in the prior action was claimed without probable cause." (*Citi-Wide Preferred Couriers, Inc. v. Golden Eagle Ins. Corp.* (2003) 114 Cal.App.4th 906, 914 [8 Cal.Rptr.3d 199].)

probable cause, we remain true to [the] mandate that the malicious abuse of process tort be construed narrowly in favor of the right of access to the courts. [Citation.] As the Tennessee Supreme Court in *Swepson v. Davis*, 109 Tenn. 99, 70 S.W. 65, 69 (1902), aptly observed in the context of a malicious prosecution case: 'We know of no authority, and have been cited to none, holding that it is necessary for the plaintiff in his original suit to sustain every allegation or charge made in his bill, or else be liable to a suit for malicious prosecution. If this be the correct doctrine, then in every suit for malicious prosecution there must be a separate investigation and retrial of each separate allegation made in the original suit, without reference to the result of the suit as a whole, and the final decree therein. The only sound and tenable rule in cases of malicious prosecution is . . . to settle the question whether the original suit was successfully prosecuted or not by the decree therein upon the final adjudication, and not by the separate allegations and charges, and the proof for and against each.' This rationale recognizes that the litigation process must allow plaintiffs room to frame the issues and make changes in their approach when necessary." (*Fleetwood Retail Corp. v. LeDoux* (2007) 142 N.M. 150 [164 P.3d 31, 37]; see also *Joseph H. Held & Associates, Inc. v. Wolff* (Mo.Ct.App. 2001) 39 S.W.3d 59; *Moity v. Bodin* (La.Ct.App. 1986) 489 So.2d 474; Crystal, *supra*, 32 Wake Forest L.Rev. at p. 688 ["the California Supreme Court's decision in *Crowley v. Katleman* seems wrong" (Fn. omitted.)].)

It does seem odd that a remedy for excessive litigation expands the opportunity for lawsuits. (See *Southern Christian Leadership Conference v. Al Malaikah Auditorium Co.* (1991) 230 Cal.App.3d 207, 228 [281 Cal.Rptr. 216].)[13] Moreover, a proliferation of malicious prosecution actions against attorneys can increase the cost of legal services[14] and affect the attorney-client relationship.

Civil litigators face difficulties as a result of the decision in *Crowley, supra*, 8 Cal.4th 666, which difficulties are highlighted by the instant case. They may believe that their clients have a right to recovery, but if they assert various alternative causes of action, they face a possible malicious prosecution claim; and if they fail to allege such alternative causes of action they risk a malpractice claim—as suggested by the trial court in the instant case.

---

[13] See *Drummond v. Desmarais* (2009) 176 Cal.App.4th 439 [98 Cal.Rptr.3d 183] (malicious prosecution action brought against an attorney for bringing a malicious prosecution action).

[14] If there is insurance coverage for malicious prosecution, there might be a duty to defend even though under Insurance Code section 533 and Civil Code section 1668 there is no obligation to indemnify. (See *Downey Venture v. LMI Ins. Co., supra*, 66 Cal.App.4th 478.)

(See *Marijanovic v. Gray, York & Duffy, supra,* 137 Cal.App.4th at p. 1272, fn. 5 ["it could well constitute malpractice for an attorney to drop a lawsuit, for which supporting evidence existed, merely because opposing counsel asserted the action was baseless"].)[15]

Attorneys defending a claim often file an answer denying all liability and asserting a score of affirmative defenses, most of which have no relationship to the case. At worst, the assertion of a frivolous defense may lead to sanctions under Code of Civil Procedure section 128.5, but not to exposure to a claim in an independent lawsuit.[16] An attorney who asserts a good faith defense for a client does not expect any adverse consequences for alleging a variety of possible defenses that may have no applicability to the litigation. The same conduct by an attorney filing a complaint exposes him or her to a malicious prosecution action.

In this case, it would not be unreasonable to assume that the Mint's marketing campaign interfered with the rights of Manatt's clients. At first glance, the executors of the Princess Diana estate and trustee of the Diana, Princess of Wales Memorial Fund, might reasonably be apprehensive about a United States company marketing goods that use the name and likeness of Princess Diana and suggesting that proceeds from the sale of those goods will go to an undisclosed Princess Diana charity.[17] The executors and the trust justifiably could believe this was a prelude to many other companies doing the same thing, thereby adversely affecting the charitable activities of the Princess Diana estate and trust. Whether or not there is under existing law a valid claim that can be asserted to prevent such conduct is another matter. But if there was probable cause to assert a claim under one theory, should the attorneys be vulnerable to a malicious prosecution for asserting other claims arising out of the same operative facts? The claims of right of publicity and false designation of origin under the Lanham Act (15 U.S.C. § 1125(a))—the two claims found to be based on probable cause—seemingly arise for the most part under the same operative facts upon which the trademark dilution claim under the Lanham Act (15 U.S.C. § 1125(c)) is based. The false advertising claim under the Lanham Act may be more distinct from the other claims, although related.

---

[15] I concede that if there is probable cause for one cause of action, it would be more difficult to establish malice for an alternative cause of action lacking probable cause.

[16] A tort of malicious defense is recognized in few jurisdictions. (*California Physicians' Service v. Superior Court* (1992) 9 Cal.App.4th 1321, 1325 [12 Cal.Rptr.2d 95]; *Young v. Allstate Ins. Co.* (2008) 119 Haw. 403 [198 P.3d 666]; see also generally *Aranson v. Schroeder* (1995) 140 N.H. 359 [671 A.2d 1023] [adopting malicious defense tort].)

[17] As plaintiffs prevailed in the underlying action, I do not question their conduct.

My point in this part is to suggest the dangers attorneys face making allegations in a complaint in the hope of fitting the injury to a client into several alternative legal theories, expanding a legal theory, or developing facts during discovery to support the claims or theories. Perhaps it is safer to omit alternative theories in the anticipation that after discovery, the complaint may be amended. But I doubt that many choose this potentially unwieldy option.

I would affirm the judgment.

Respondents' petition for review by the Supreme Court was denied July 21, 2010, S183545. George, C. J., did not participate therein. Moreno, J., was of the opinion that the petition should be granted.